**JEWEL TEA CO., Inc., a New York corporation, Plaintiff-Appellee,**

v.

**LOCAL UNIONS NOS. 189, 262, 320, 546, 547, 571 and 638, AMALGAMATED MEAT CUTTERS & BUTCHER WORKMEN OF NORTH AMERICA, AFL-CIO, et al., Defendants-Appellants.**

**No. 12653.**

United States Court of Appeals
Seventh Circuit.
Jan. 11, 1960.

---

Bernard Dunau, Washington, D. C., Lester Asher, Robert C. Eardley, Joseph E. Gubbins, Leo Segall, Chicago, Ill., for appellants.

George B. Christensen, Fred H. Daugherty, Richard W. Austin, Chicago, Ill., Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel, for appellee.

Before DUFFY and SCHNACKENBERG, Circuit Judges, and PLATT, District Judge.

SCHNACKENBERG, Circuit Judge.

Appellee, plaintiff below, is Jewel Tea Company, Inc. (herein called Jewel), a New York corporation operating 196 retail stores in and around the Chicago area, including four stores in northwestern Indiana. Defendants, Local Unions Nos. 189, 262, 320, 546, 547, 571 and 638 of Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (herein sometimes referred to as unions), Earl Saltow, Frank Fox, Earl Heinz, Harold L. Rosa, George Flosi, Lester Ferguson, Fred Clavio, Alex M. Nielubowski, Thomas F. Gorman, R. Emmett Kelly, Mark Cantrell, Casimir Walezak, Stanley Brodzinski and William A. Stepan, officers and representatives of said unions, appeal from orders denying, and adhering to the denial, a motion to dismiss Jewel's complaint alleging a violation of §§ 1 and 2 of the Sherman Antitrust Act.[1] The court below entered an order authorizing an immediate appeal.[2] Also named as defendants, but not parties to the appeal, are Associated Food Retailers of Greater Chicago, Inc., an Illinois corporation (herein referred to as Associated), a not-for-profit trade association representing several thousand individual or independent food stores engaged in the retail sale of meat in the Greater Chicago area, and Charles H. Bromann, secretary and treasurer of Associated.

The complaint alleges that there are approximately 9,000 retail food stores in the Chicago area which sell meats, fish and poultry; their annual sales of such products exceed $5,000,000,000. Substantial portions of the meats and allied products so sold are acquired from without Illinois or acquired from suppliers in Illinois who have purchased said meats from out-of-state sources for resale to meat distributors, wholesalers and retail food stores in the Chicago area. Approximately 77.5% of such products retailed by plaintiff originate outside Illinois. Plaintiff's sales of meats, poultry, fish and similar items customarily sold in meat markets were approximately $85,000,000 in 1957.

Final preparation of the meats for sale to the public is generally performed by the retail meat markets themselves which employ and supervise members of defendant unions who perform this work. Jewel has introduced a "pre-packaged, self-service" system in approximately 174 of its stores, whereby the meat is cut, trimmed and wrapped in sanitary, transparent, cellophane packages in advance of sale. Under this system customers are able to purchase meat without waiting for services of a butcher, and butchers are able to prepare the meats without customer interruptions. Because of modern refrigeration equipment installed by plaintiff, prepackaged meats can be sold during evening hours without a butcher in attendance.

The complaint further alleges that in the Chicago area there is a widespread demand that meat be available for retail purchase one or more evenings a week since in many households both husband

---

1. 15 U.S.C.A. §§ 1, 2.

2. 28 U.S.C.A. § 1292(b).

and wife work during daytime hours or the family automobile is available for marketing only in the evening. Plaintiff would so provide convenient evening hours for sale of its meats except for an alleged conspiracy, which is the subject matter of this suit.

It is alleged that beginning ten years ago, and continuing thenceforth, defendants have engaged in an unlawful combination and conspiracy to suppress competition among retail meat markets in the Chicago area and wholly to prevent the sale of meats and meat products before 9 a. m. or after 6 p. m. Mondays through Saturdays. In furtherance of this alleged combination or conspiracy, the defendants entered into an agreement, the substantial terms of which, according to the complaint, are that they agreed

"(a) That no person or firm be permitted to engage in the retail sale of fresh beef, veal, lamb, mutton or pork before 9:00 A.M. or after 6:00 P.M.

"(b) That defendant locals and their officials and representatives named herein refuse to allow members of their organizations to sell fresh beef, veal, lamb, mutton or pork at retail before 9:00 A.M. or after 6:00 P.M.

"(c) That no person or firm be permitted to sell fresh beef, veal, lamb, mutton or pork at retail before 9:00 A.M. or after 6:00 P.M. with or without the employment of members of defendant unions outside those hours.

"(d) The co-conspirator members of defendant Associated have agreed among themselves to insist that all collective bargaining agreements entered into between them and defendant unions or between defendant unions and plaintiff or other opera-

tors of food stores shall contain provisions prohibiting the sale at retail of fresh beef, veal, lamb, mutton or pork before 9:00 A.M. and after 6:00 P.M.

"(e) Associated, its members and officers have conspired and agreed with the other defendants that neither plaintiff nor any other merchandiser is to be permitted to compete lawfully with them by operating self-service meat markets between the hours of 6:00 P.M. and 9:00 P.M.

"(f) That defendant unions, their officers and members have acted as the enforcing agent of the conspiracy."

Under compulsion of the alleged conspiracy and the threat of strike by the unions, plaintiff asserts that it was forced to sign in late January and early February 1958 contracts with defendant unions containing the following restriction:

"Market operating hours shall be 9:00 a. m. to 6:00 p. m. Monday through Saturday, inclusive. No customer shall be served who comes into the market before or after the hours set forth above."[3]

The remaining provisions of the collective bargaining contracts concern hours, wages and conditions of employment.

■ 1. The core of appellants' position in their motion to dismiss is that "the provisions pertaining to market operating hours and the basic work day are opposite sides of the same coin," since, as they assert, a change in one automatically affects the other. And because one side of this coin, hours of employment, is governed by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., *ipso facto* the reverse side is also within the exclusive regulatory scope of that act. Not only is the conclusion fallacious,

3. This provision appears in each of two different collective bargaining agreements, one known as a "Service Contract" and applicable to "Service Meat Markets," the other known as a "Self-Service Contract" and applicable to "Self-Service Meat Markets." Each agreement effective October 6, 1957, runs until October 3, 1959, and from year to year thereafter, unless terminated by written notice given not less than 60 days prior to each expiration date.

but also the basic premise from which it is derived. An employer has the right and it is his duty, if he is to survive commercially, first to determine the needs of the public, second to provide a time, a place and facilities for meeting those needs, and third to provide, under the terms of the National Labor Relations Act, the services of employees to accomplish the foregoing objectives. The rights of labor attach only to the third, and if any effort is made by labor to infringe rights of the employer in the first or second field, it is not shielded from the sword of the antitrust laws. Determining the needs of the public and meeting those needs are inherent proprietary rights and obligations of the employer and must be clearly distinguished from his rights and duties as master in the master and servant relationship. Setting marketing hours is one such proprietary function which an employer has the exclusive right to determine as dictated by economic factors present within his trading area.

Facts set forth in the complaint show a "widespread public demand in the Chicago area that meat be available for retail purchase at Jewel stores during one or more evenings of the week." Plaintiff has an untrammeled right to determine its course of action in respect to this matter.

Whether one system of marketing or another offers the greater good and better prices in any given community is to be determined by the public: the laws of free competition may not be thwarted by a combination of employers and unions who conspire to prevent commercial development.

Appellants rely on Local 24 of Intern. Broth. of Teamsters, etc. v. Oliver, 1959, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 to sustain their argument that market operating hours are so intimately connected with hours of employment that the two cannot be divorced. In that case several local unions entered into a collective bargaining agreement with a group of interstate motor carriers providing for regulation of rental fees and wages paid to owner-drivers of vehicles leased to the carriers. The court held that the leasing of these vehicles was a matter of collective bargaining, but carefully qualified this holding by stating, 358 U.S. at page 293, 79 S.Ct. at page 303:

> "The text of the Article [agreement] and its unchallenged history show that its objective is to protect the negotiated wage scale against the possible undermining through diminution of the owner's wages for driving which might result from a rental which did not cover his operating costs. This is thus but an instance, as this Court said of a somewhat similar union demand in another case, in which a union seeks to protect lawful employee interests against what is believed, rightly or wrongly, to be 'a scheme or device utilized for the purpose of escaping the payment of union wages and the assumption of working conditions commensurate with those imposed under union standards.' Milk Wagon Drivers' Union etc. v. Lake Valley Farm Products, Inc., 311 U.S. 91, 98–99, 61 S.Ct. 122, 126, 85 L.Ed. 63 * * *. The regulations embody not the 'remote and indirect approach to the subject of wages' * * * but a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract."

Although exercise of an employer's proprietary right to establish marketing hours may incidentally affect its employees, as will almost anything it does, it can hardly be argued that such action is a "direct frontal attack" upon or even a "remote and indirect approach" to the subject of the basic work day. It is conceivable that maintenance of meat markets during evening hours will create even more jobs for union employees.

■ 2. Appellants next assert that an agreement pertaining to market operating hours is exempt from the antitrust laws since it was entered into in the self-interest of the employees to at-

tain or maintain conditions deemed by the union relevant to the employees' working welfare. United States v. Hutcheson, 1941, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788. However, appellants recognize that Allen Bradley Co. v. Local Union No. 3, IBEW, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, qualifies this exemption. The Supreme Court there stated, 325 U.S. at pages 808–810, 65 S.Ct. at page 1539:

> " * * * Congress never intended that unions could, consistently with the Sherman Act, aid non-labor groups to create business monopolies and *to control the marketing of goods and services.*
>
> * * * * * *
>
> "Our holding means that the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups." (Emphasis supplied.)

The complaint states that defendant Associated is a trade association consisting of "several thousand individual or independent food stores engaged in the retail sale of meat for human consumption in the Greater Chicago area." The complaint further states that for many years past defendant Associated and its co-conspirator members and Bromann and the defendant unions, their officers and members, have insisted, despite public demand and interest to the contrary, that contracts between defendant unions and all operators of retail meat markets contain provisions prohibiting the retail sale of meat after 6 p. m. and have exercised the unions' monopoly powers to effectuate that insistence.

The operation of this agreement has enabled Associated stores to remain closed after 6 p. m. without fear of losing trade to plaintiff, a major competitor, because of evening sales, and also to avoid the added expense of remaining open during the evening. Any attempt to clothe the alleged conspiracy with a robe of propriety by making the union a co-conspirator is to make the latter a vehicle for exempting an otherwise unlawful activity from the sweep of the Sherman Act. This the antitrust laws will not condone.[4]

■■ 3. To establish a violation of the Sherman Act the alleged contract, combination or conspiracy must be "in restraint of trade or commerce *among the several States * * *.*" (15 U.S. C.A. § 1, emphasis supplied.) Appellants admit that the complaint sufficiently alleges the interstate flow of meats into the Chicago market, but assert that failure to allege diminution of this inflow is fatal to plaintiff's cause of action, since the retail trade of meats over the counter is purely a "local intrastate activity" which cannot in and of itself adversely affect interstate commerce. The complaint avers that the effects of the alleged unlawful agreement to limit marketing hours to 9 a. m. to 6 p. m. has been to restrain the flow of interstate trade and commerce of meats and meat products, and to maintain the price of retail meats above what they would otherwise be. In accordance with United States v. Employing Plasterers' Ass'n, 1954, 347 U.S. 186, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618, we hold that the complaint properly charges a restraint of interstate commerce, and that plaintiff should be given an opportunity to introduce evidence to prove that these local restraints unreasonably burden the free and uninterrupted flow of meats into the Chicago market. "That wholly local business restraints can produce the effects condemned by the Sherman Act is no longer open to question." Ibid. See also United States v. Employing Lathers Ass'n, 1954, 347 U.S. 198, 74 S.Ct. 135, 98 L. Ed. 627; Local 167, etc. v. United States, 1934, 291 U.S. 293, 54 S.Ct. 396, 78 L. Ed. 804; Sandidge v. Rogers, 7 Cir., 1958, 256 F.2d 269, 276.

---

4. Associated and Bromann have entrusted their interests in the defense of this suit to counsel for the unions. They formally adopted by reference the latter's motions and briefs.

4. Appellants urge that the agreements in question to set market hours come within "the rule of reason", and are therefore not an unreasonable restraint of trade. United States v. American Tobacco Co., 1911, 221 U.S. 106, 179, 31 S.Ct. 632, 648, 55 L.Ed. 663. It is clear that a mere agreement to eliminate competition is not enough to condemn it, unless a *per se* violation. Northern Pac. Ry. Co. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed. 2d 545; Klor's, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741. A close and objective scrutiny of particular conditions and purposes is necessary in each case. Appalachian Coals Inc. v. United States, 1933, 288 U.S. 344, 360, 53 S.Ct. 471, 77 L.Ed. 825. Therefore, such a determination cannot be disposed of on a motion to dismiss but must be properly aired in a trial where both parties have an opportunity to offer evidence as to facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual and probable; and the history of the restraint, *i. e.*, the evil believed to exist, the reason for adopting the particular remedy, and the purpose or end sought to be attained. Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683. It is sufficient to permit the matter to go to trial in that the complaint alleges the unreasonableness of the restraint.

5. Appellants next assert that plaintiff is without standing to sue because, as a party to the alleged illegal agreement it is *in pari delicto*. Appellants concede, however, that the *in pari delicto* defense does not apply where plaintiff's participation in the wrong alleged was induced by economic necessity, or where plaintiff's wrongful act is divorced from the illegal conspiracy, agreement or combination alleged in the complaint.

Appellants rely principally on Lewis v. Quality Coal Corp., 7 Cir., 1959, 270 F.2d 140, where this court held that "the threat to cause a *legal* strike and its attendant work stoppage does not of itself constitute duress." (Emphasis supplied.) Id., at page 143. Unlike the alleged illegal agreement here, the majority opinion there held that the contract in question was legal. When a business organization is the victim of an *illegal conspiracy* between certain of its competitors and a labor union to restrain trade, the business organization is not required to fight the matter out by economic warfare thus subjecting its employees who are not members of the offending union, its customers, and its stockholders, to the losses, inconvenience and damages of a strike, all for the purpose of shielding itself from the *in pari delicto* stigma.

In view of the factual situation which confronted plaintiff, the defense of *in pari delicto* is not available here. Private suits are merely a vehicle intended to further enforce the antitrust laws for the benefit of the real party in interest, the public. In the case at bar, the *in pari delicto* defense, therefore, cannot be allowed to thwart this congressional attempt to protect the public. The Supreme Court in Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219, stated:

"If petitioner and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured."

6. Appellants finally urge that plaintiff has suffered no injury to its business or property since the volume of goods purchased would remain relatively constant regardless of any change in marketing hours. However, plaintiff alleges in its complaint that the illegal conspiracy eliminates operating

economies which are available to plaintiff through evening operation of its special refrigerated cases and other capital equipment and proper utilization of labor. Thereby, the public has been denied the benefit of lower prices and plaintiff has suffered loss of profits. As this court held in A. C. Becken Co. v. Gemex Corp., 7 Cir., 1959, 272 F.2d 1, where the fact of actual damages has been proven, mere speculation as to the amount of those damages will not defeat the plaintiff's right to recover. We hold that this complaint properly alleges facts, which, if proven, will establish the fact of actual damages.

For the reasons hereinbefore set forth the orders of the district court are affirmed and this cause is remanded for further proceedings not inconsistent with the views herein expressed.

Affirmed and remanded for further proceedings.