**BAILEY'S BAKERY, LTD. (a Hawaiian corporation), Plaintiff,**

v.

**CONTINENTAL BAKING COMPANY (a Delaware corporation) and Love's Biscuit & Bread Co., Ltd. (a Delaware corporation), Defendants.**

**Civ. No. 2113.**

United States District Court
D. Hawaii.

Sept. 21, 1964.

Kashiwa & Kashiwa, Honolulu, Hawaii, Maxwell Keith, San Francisco, Cal., for plaintiff.

John H. Schafer, of Covington & Burling, Washington, D. C., for Continental Baking Co.

William M. Swope, of Smith, Wild, Beebe & Cades, Honolulu, Hawaii, for Love's Biscuit & Bread Co.

PENCE, Chief Judge.

This is the second round of this civil antitrust suit. In the first round, this court dismissed the complaint as not pleading facts sufficient to state a cause of action, but granted plaintiff leave to amend. Plaintiff's Second Amended Complaint was countered with defendants' motion to dismiss for failure to state a claim upon which relief can be granted, and an alternate motion to strike the complaint in its entirety. This court was sorely tempted to grant the motion to strike on the ground that the complaint was too long—78 pages—and so full of immaterial facts and conclusory statements that it was objectionable under Rule 8, F.R.Civ.P.

Frankly, it was largely out of compassion and patience that this court did not grant the motion to strike, and this court's refusal to do so must not be taken by the plaintiff, or by any other plaintiffs in any future case, as a precedent. That this court's decision on defendants' motions has been so delayed is in a very large measure due to the prolixity of this amended complaint. If faced again with a similar pleading, it is more than highly probable that a motion to strike would be granted.

Having reluctantly undertaken the burden of ruling on the sufficiency of this Second Amended Complaint, defendants' motion to strike based on Rule 8, is denied.

This second amended complaint contains two counts. Count I: an allegation that the outright purchase in March of 1960 by defendant Continental Baking Company (Continental) of Love's Biscuit & Bread Co., Ltd., a Hawaiian corporation (Love's Hawaii), and the formation of a Delaware corporation of the same name (Love's) to take over all of the assets of Love's Hawaii, and the actions of the defendants thereafter, violated and still violate Section 7 of the Clayton Act; and Count II: allegations that the defendants have violated and are now violating Sections 1, 2 and 3 of the Sherman Act. Plaintiff asks treble damages under each count.

After winnowing the kernels from the mass of straw and chaff of the complaint, the material facts alleged in Count I are:

(VI) Continental is one of the largest baking companies in the United States and carries on an interstate baking business.

(VII) Prior to its sale to Continental, Love's Hawaii had acquired a monopoly (83%) of the total bread and bread-type rolls market in the City & County of Honolulu, while plaintiff had about 10% of that market. About 99% of the ingredients which go into the manufacture of bread and bread-type rolls and bread wrapping materials and baking equipment are imported from the mainland to Hawaii, and thus flow in interstate commerce into the several bakeries in Hawaii.

(VIII) The raw materials and wrappings were manufactured into bread and bread-type rolls and sold wholesale in the City & County of Honolulu geographic market area, and the ultimate consumers of the bread and bread-type rolls sold in the Honolulu market were persons in Honolulu, including tourists passing through; also, ships in commerce bought the same when they called at Honolulu; the U. S. Navy and Coast Guard ships sailing out of Honolulu

bought the same for consumption aboard and delivery to Pacific islands under United States control; commercial fishermen fishing in international waters bought the same; airlines purchased the same for consumption in interstate flights; contractors on Pacific islands also bought the same for their operations.

Further, (IX) five bakeries in Honolulu, including the plaintiff and defendant Love's Hawaii, competed in the bread and bread-type rolls market at the wholesale level in the City & County of Honolulu. For many years prior to March 1960, Love's Hawaii had a monopoly (83%) of the bread and bread-type rolls market in Honolulu and because of such monopoly power, possessed the power and ability to set and control prices of the products in the Honolulu market and to restrict competition therein. Competing bakeries were forced to follow the prices set by Love's Hawaii because Love's Hawaii prices were so low that the plaintiff and other competing bakeries could not undersell nor price higher than Love's Hawaii and still stay in business. Prices set by Love's Hawaii during the 10-year period before March 1960 were lower than corresponding prices for like products in Pacific coast cities, in spite of the ocean shipping costs. On Army and Navy purchases, Love's Hawaii bid lower than its wholesale prices and plaintiff and other bakers could not meet Love's Hawaii's bid prices. Love's Hawaii intentionally held its bid and wholesale prices down to a minimum to keep out mainland competition.

Also, (X) Continental is the largest bread bakery corporation in the United States, running its entire chain of bakeries as a total enterprise, with its many subsidiaries operating as an integrated unit throughout the United States, and selling its bakery products in interstate commerce, with Continental controlling the standards of production of subsidiaries, the nature and extent of repairs to plants, personnel policies, and monies collected and spent by its subsidiary bakeries. Continental and Love's were

therefore engaged in commerce in its Hawaii-Pacific area operations as part of its nation-wide operation, and Continental is subject to the jurisdiction of the Federal Trade Commission.

(XI and XII) In March 1960, Continental acquired Love's Hawaii with the intent of continuing on the low prices of Love's Hawaii and preventing possible mainland competition in Hawaii, and eliminating small bakeries.

(XIII) The acquisition of Love's Hawaii by Continental was illegal and unlawful under Section 7 of the Clayton Act, and the effect of the acquisition may have, or did, substantially lessen competition by strengthening the existing monopoly of Love's Hawaii and directly affecting interstate commerce, both in interstate commerce in raw materials going into bread and bread-type rolls and the bread and bread-type rolls market in the Honolulu market area.

Further, (XIV and XV) immediately after the purchase of Love's Hawaii, the defendants continued to carry on Love's Hawaii's low price ("Love's suffocation") plan with the intent to restrain mainland baking companies from possibly coming into the Honolulu market, and supermarkets from establishing their own bakeries, as well as to eliminate local competition.

(XVI) To increase their dominance of the Honolulu market, Love's carried out an extensive advertising program and continued to sell its bread and bread-type rolls at prices lower than that for comparative products on the Pacific coast. Between March 1960 and May 1962, Love's introduced 13 new varieties of bread into the Honolulu market, accompanying each new introduction with expensive advertising. (P. 38).

The next six pages of Count I of the complaint are taken up with the allegation that in March 1961 Continental introduced its Wonder loaf into the Honolulu market and that in connection therewith, Love's and Continental conspired to put out its Wonder loaf as a sandwich-shape loaf so as not to compete in the

"round top market of bread" in the Honolulu market. The sandwich-shape Wonder loaf was directly aimed at the plaintiff, in that it was the leading producer of the one-pound sandwich loaf. (It was only by studied reading of the complaint that this court could finally determine that the Wonder loaf was made and baked by Love's here in Hawaii.)

Moreover, (P. 47) by printing the retail price on its bread, the defendants forced the retailers to sell the bread at that price, and the defendants were thereby fixing the minimum retail price of the one-pound round top loaves. (P. 48) By aggressive action of its driver-salesmen, Love's supplied bread racks to retailers and thereafter preempted the best sales space in the racks. (P. 49) Love's gave premium prizes, as community club awards, for collections of Love's wrappers.

(XVIII and XIX) The plaintiff then alleged its own profits and own losses over the years 1960, 1961 and 1962, showing that its 1960 profits had turned into losses by 1962. The over-all effects of the wrongful acquisition by Continental of Love's Hawaii caused plaintiff losses, with the resulting loss of credit, whereby the plaintiff was unable to purchase its flour, shortening, wrapping, etc., on the mainland. All of the acts alleged had substantially and materially interfered with the natural flow of interstate commerce, and (XX) because of its injuries from defendants' acts in violation of Section 7 of the Clayton Act, the plaintiff asked for treble damages.

Plaintiff's Count II begins on page 58 of the complaint and by reference, includes fourteen out of the preceding twenty paragraphs of Count I (¶¶ XII, XIII, and XVII–XX are left out), and charges (P. 58) the defendants with violating Sections 1, 2 and 3 of the Sherman Act by unlawfully contracting, combining and conspiring to monopolize and restrain commerce in the bread and bread-type roll line of commerce in the City and County of Honolulu geographic market. The alleged conspiracy (P. 59–63) was that the defendants did conspire to eliminate and suppress competition between themselves and others to maintain and increase their dominance of 80% of the total bread and bread-type roll line of commerce in the Honolulu market with the intent to exclude competition from the outside and destroy it within, by using methods set forth in the allegations in Count I. Such actions on the part of the defendants have directly and substantially restrained interstate commerce as set forth in Count I, whereby (P. 63–69) the plaintiff's business was changed from a profitable one to an almost insolvent one in a period of three years, and plaintiff's credit was destroyed so that it can no longer purchase materials necessary for its bread and bread-type rolls from the mainland but is forced to purchase either locally or in small volume from the mainland. Because of defendants' low bids in Army and Navy bids, (P. 69) defendants have made it futile for plaintiff to bid on the same. (P. 70–72) The acts of the defendants were prejudicial to the public in that defendants' acts will lead to the elimination of small business in a manner that is prohibited *per se* by Section 2 of the Sherman Act. Wherefore, plaintiff seeks treble damages of the defendants.

*Markets Involved*

■ In determining whether defendants' allegedly unlawful acts affected interstate commerce, this court must again rule whether or not any or all of the commerce herein involved is "interstate." In attempting to simplify one of its major problems, plaintiff has again alleged (P. 14) that inasmuch as Hawaii became a State on August 21, 1959, under the terms of the Admissions Act,[1] the statutory and artificial status of interstate commerce applied to *all* commerce in the State of Hawaii until August 21, 1961. For the factual and legal reasons fully developed in this court's December 17, 1963 ruling on plaintiff's First Amended

1. Hawaii State Admissions Act, Public Law 86–3, 86th Congress.

Complaint, this allegation is again held to be without merit.

■ As this court also ruled in that same 1963 decision, while minutely *detailed* allegations of fact are not necessary, the complaint must allege facts showing that the defendants' acts unduly and appreciably restrained or may reasonably be expected to restrain the free flow of interstate commerce. Although plaintiff has here gone to extensive lengths in attempting to allege facts showing that the flow of materials going into the manufacture of bread and bread-type rolls in Honolulu—materials which are concededly in interstate commerce—continues on with unbroken force into the baked bread and bread-type rolls market, thereby making the finished bread products as sold by the plaintiff and defendants in the Honolulu market also in that same stream of interstate commerce, the facts alleged show, however, that this is not so.

Nowhere does this court find in the allegations of either count that the alleged unlawful acts and transactions of the defendants which form the basis of plaintiff's cause of action, occurred in the course of the admittedly interstate commerce in the market of baking materials and supplies, or restricted in any direct way plaintiff's access to that market. While the allegations show plaintiff's bread products sales fell and its credit thereby failed, there is no factual allegation that the volume of raw materials flowing into the Honolulu market was restrained or affected either qualitatively or quantitatively by any alleged acts of the defendants,[2] nor was there any allegation that Continental's acquisition of Love's Hawaii, or Love's own acts were directed at or did restrain plaintiff's access to the financial market (i. e. credit).

The stream of commerce in the baking materials market, on the facts alleged, appears factually and legally to be com-

pletely severable from the stream of commerce which may arise after the raw materials have reached the bakery and the processes of transforming the same into bread products on the grocers' shelves and consumers' mouths has taken place in the Honolulu bread and bread-type rolls market area.

The flow of baking material and supplies here must be legally treated as was the flow of gas in East Ohio Gas Co. v. Tax Comm., 283 U.S. 465, 471, 51 S.Ct. 499, 501, 75 L.Ed. 1171 (1931), when it passed from the high pressure transmission lines (interstate) into the supply mains: "The treatment and division of the large compressed volume of gas is like the breaking of an original package, after shipment in interstate commerce, in order that its contents may be treated, prepared for sale, and sold at retail."; or as in Lawson v. Woodmere, 217 F.2d 148, 150 (4th Cir. 1954), where burial vaults cease to flow in interstate commerce when held for local sale; or, Central Ice Cream Co. v. Golden Rod Ice Cream Co., 184 F.Supp. 312, 319, (N.D.Ill.1960), where the flavoring extracts, nuts, sugar and cocoa going into the ice cream all came from outside Illinois, nevertheless the commerce in those ingredients ceased when they were made into ice cream.[3]

There is clearly a distinction between the facts here and those in Pevely Dairy Co. v. United States, 178 F.2d 363 (8th Cir. 1949), where, upon the authority of Binderup v. Pathe Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308 (1923): "The general rule is that where transportation has acquired an interstate character 'it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.' ",[4] the court held the flow of milk shipped in interstate commerce remained in commerce until it reached the ultimate consumer. Here,

---

2. See Page v. Work, 290 F.2d 323, 333 (9th Cir. 1961), cert. denied 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961).

3. See also cases cited by this court in its prior decision, page 10, on plaintiff's First Amended Complaint.

4. 178 F.2d at 366.

from the allegations it plainly appears that the movement of all of the raw materials, supplies and equipment going into the manufacture of bread and bread-type rolls ended at the bakery—where the mainland shipper and the Honolulu receiver intended that it should end.

All of the monopolistic and discriminatory acts of the defendants were alleged to have taken place in the bread and bread-type rolls market in the City and County of Honolulu geographic area. Plaintiff's broad allegation that defendants' acts affected or restrained the interstate commerce in the bakery's raw materials and supplies market is not factually substantiated by the pleading itself, Newbury Port Water Co. v. Newbury Port, 193 U.S. 561, 24 S.Ct. 553, 48 L.Ed. 795 nor do the facts alleged fit into the pattern of United States v. Employing Plasterers Assn., 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954), or Jewel Tea Co. v. Local Unions, 274 F.2d 217 (7th Cir. 1960), or Las Vegas Merchant Plumbers Ass'n. v. United States, 210 F.2d 732 (9th Cir. 1954) cert. denied 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954), or Northern California Pharmaceutical Ass'n v. United States, 306 F.2d 379 (9th Cir. 1962), so that this court can apply the law set forth in those cases to the facts here. The pleadings clearly show that the bread and bread-type rolls market in Honolulu is a market distinct from the bakery materials and supplies market.

Plaintiff has contended that this court may not summarily determine from the pleadings and without trial by jury the jurisdictional issue as to whether or not any relevant market in commerce is affected by defendants' alleged unlawful acts. It is urged that the language of the Ninth Circuit Court of Appeals: "The theory that the existence of an effect on interstate commerce is a jurisdictional fact, enabling the judge to determine the issue for himself * * * will in practice deprive plaintiffs of their right to a jury trial",[5] forecloses this court from summarily finding that plaintiff has not alleged facts showing that interstate commerce is affected by defendants' acts.

■ As indicated by Judge Mathes in Shaffer v. Coty, Inc., 183 F.Supp. 662, 668 (D.C.S.D.Cal. May 1960), since want of Federal jurisdiction renders nugatory proceedings on the merits, to compel the submission of jurisdictional-facts issues for jury determination is contrary to both the spirit and the letter of the Rules. (F.R.Civ.P. 12(b) (1), 12(d), 12(h) (2), 41(b), 43(e), 52(a)). The only exception would be those cases where, as in Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), the question of jurisdiction is dependent on a decision of the merits. If the Marks Food case (supra note 5) appeared to go beyond the rule laid down in Land v. Dollar, the thrust of the Marks Food case has been blunted by Page v. Work, supra, wherein two of the three judges who decided the Marks Food case together with the Chief Judge of the circuit, held, upon rehearing: "Appellees made a timely motion for a summary judgment of the issue of jurisdiction. If the district court correctly concluded that appellees were entitled to a summary judgment, appellant cannot complain of the deprivation of a jury trial. * * * Appellees were entitled to a summary judgment on the question of federal jurisdiction if no genuine issue existed as to any material fact and if the moving party was entitled to a judgment as a matter of law."[6] Rule 56, F.R.Civ.P.

The basic allegations in support of its contention that the bread and bread-type rolls market in the geographical area of the City and County of Honolulu is a market in a line of commerce are: (1) tourists in Honolulu eat the bread; (2) the Army buys it; (3) the Navy and Coast Guard, airlines and ocean-going ships, commercial fishermen fishing in in-

5. Marks Food Corp. v. Barbara Ann Baking Co., 274 F.2d 934, 935 note 1 (9th Cir. Feb. 1960).

6. 290 F.2d at 334.

ternational waters, and contractors with projects on Pacific islands, all buy it for consumption outside of Hawaii; (4) Love's used Continental's nationally advertised and copyrighted "Wonder Bread" product name on one of Love's breads sold in the Honolulu market.

█ The service to tourists in Honolulu while they are disassociated from transportation does not, *ipso facto,* move such bread into the stream of interstate commerce.[7]

█ The alleged sales to the Army and Navy would appear to be but purely intrastate transactions and would not be transformed into transactions in interstate commerce merely because the bread was incidentally taken by the Army or Navy out of Honolulu (i. e., if it were not bought for the specific purpose of use outside of Honolulu).[8]

Plaintiff's allegations of sales to the Navy and Coast Guard for use outside of the Honolulu market, sales to trans-Pacific airlines and ships for the same purpose, and sales to fishermen, do allege sales in interstate and foreign commerce.

Further, plaintiff alleges that the bringing into the Honolulu market of Continental's copyrighted and highly advertised Wonder Bread of itself manifested an impact of the merger upon interstate commerce. From the facts alleged, it appears that the bread itself was not shipped in to Hawaii by Continental for sale by Love's, but rather that Love's baked Wonder Bread loaves in Hawaii and used thereon the "Wonder" name. The allegations show the Wonder Bread sold in Hawaii was not the same Wonder Bread as sold on the mainland.

█ Since at this stage of the case no responsive answer has been filed by the defendants, and this court at this time is concerning itself as to whether the facts alleged state a cause of action, without taking into consideration any exhibits or depositions, etc., it would appear that plaintiff's allegations indicating that the ambit of the Honolulu bread products market includes the use of the Wonder Bread label, sales of bread made to overseas airlines and ships for use in interstate and foreign commerce, do thereby plead facts showing that the bread products market in Honolulu is in a line of commerce within the purview of the Federal antitrust acts.

█ Even so, the area of effective competition as set forth in the complaint, i. e., the relative market, is where the plaintiff and defendants sell bread products. The competition foreclosed by the alleged unfair practices must constitute a substantial share of the relevant market. That is to say, the opportunities for other competitors to enter into or remain in that market must be significantly limited in a substantial share of the line of commerce involved.[9]

The mere fact, however, that a portion of a market area may be in a line of commerce, does not of itself end the problem. The alleged illegal acts of the defendants must affect or restrain an appreciable amount of such interstate commerce. From the pleadings, this court cannot determine whether or not the sale of bread in the Honolulu area market made in interstate commerce constituted a separate sub-market in which the plaintiff had no participation, or in which no restraint and accompanying damage could be shown,[10] or whether the acts complained of resulted or must probably result in substantially lessening competition in the relevant interstate market, i. e., to such a degree as will in-

7. United States v. Yellow Cab, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Hotel Phillips Inc. v. Journeymen Barbers, etc, 195 F.Supp. 664 (W.D.Mo. 1961), aff'd per curiam 301 F.2d 443 (8th Cir. 1962).

8. Spencer v. Sun Oil Co., 94 F.Supp. 408 (D.Conn.1950).

9. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed. 2d 580 (1960).

10. Cf. United States v. E. I. Du Pont De Nemours Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed.2d 1264 (1956); Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510.

juriously affect the public;[11] nor can we determine whether or not the effect of defendants' acts has brought about a substantial or miniscule restraint of that commerce; nor can we determine the impact of "Wonder Bread" in or on that market.[12] These questions must remain unresolved at this "pleadings" stage.

### Count I—Clayton § 7

Defendants have urged that plaintiff's treble damage claim is impermissible under Clayton § 7, 15 U.S.C.A. § 18. Clayton § 7 is strictly an "ounce of prevention" Act, based upon a "may be" monopoly situation.

> "The Committee Reports on § 7 show, as respects the Celler-Kefauver amendments in 1950, that the objective was to prevent accretions of power which 'are individually so minute as to make it difficult to use the Sherman Act test against them.' S.Rep.No.1775, 81st Cong., 2d Sess., p. 5, U. S. Code Congressional Service 1950, p. 4297. And see H.R.Rep. No.1191, 81st Cong. 1st Sess., p. 3. As the Court stated in Brown Shoe Co. v. United States, 370 U.S. 294, 323 [82 S.Ct. 1502, 1522, 8 L.Ed.2d 510]:
>
> > " 'Congress used the words "*may be substantially to lessen competition*" (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act.' See also United States v. Philadelphia Na-

tional Bank, 374 U.S. [321], at 362 [83 S.Ct., 1715, at 1740 [10 L.Ed.2d 915], and United States v. El Paso Natural Gas Co., 377 U.S. 651 [84 S.Ct. 1044, 12 L.Ed.2d 12]." [13]

■ As has been said many times, Clayton § 7 supplements the Sherman Act and was intended primarily to *arrest* apprehended relationships *before* those relationships could work their evil. (Emphasis added) United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 597, 77 S.Ct. 872, 1 L.Ed. 1057.

■ It is a well settled rule of torts that a plaintiff is entitled to recover all damages for injuries proximately caused by wrongful acts of a defendant committed prior to the filing of the action. If damages are attributable to protracted conduct and repetitive acts which continue beyond the date an action is filed, each time the plaintiff's interest is invaded by an act of defendant, he has a new cause of action, and for any particular invasion is thus entitled to recover as damages not only for the injuries he suffers at once but also for those he will suffer in the future from that particular invasion, including what he has suffered during and will suffer after the trial.[14] However, a plaintiff cannot recover for anticipated invasions even though they were of the same general character of those he has already sustained.[15]

■ The prohibitory sanctions of Clayton § 7 are triggered to explode by and at the moment of acquisition. That, *after* the moment of acquisition, subsequent business practices do injure competitors in that market does not, because of those subsequent injurious acts,

---

11. Cf. International Shoe Co. v. Federal Trade Comm., 280 U.S. 291, 298, 50 S.Ct. 89, 74 L.Ed. 431 (1930); Transamerica Corp. v. Board of Governors, 206 F.2d 163, 170 (3rd Cir. 1953).

12. Cf. Atlantic Co. v. Citizens Ice & Cold Storage Co., 178 F.2d 453 (5th Cir. 1949); United States v. Frankfort Distilleries, 324 U.S. 293, 297, 65 S.Ct. 661, 89 L.Ed. 951 (1945).

13. United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964).

14. Lawlor v. Loewe, 235 U.S. 522, 35 S.Ct. 170, 59 L.Ed. 341 (1914).

15. Connecticut Importing Co. v. Frankfort Distilleries, 101 F.2d 79 (2nd Cir. 1939).

give rise to a claim for treble damages under Clayton § 7.

 Since Clayton § 7 is concerned with the future monopolistic and restraining tendencies of corporate acquisition, i. e., probable (and hence not certain) future restraints on commerce, any damages claimed for prospective restraint of trade would be purely speculative,[16] and a plaintiff cannot recover money damages for anticipated but unimplemented acts of restraint which may invade its interests.[17] While Clayton § 7 permits private injunctive and divestiture actions in merger situations which may result in the proscribed restraints or monopolies,[18] nevertheless, no private action for treble damages accrues from a Clayton § 7 acquisition.[19] Count I fails to state a cause of action.

*Count II—Sherman Act §§ 1, 2, 3*

This case is still in the pleading stage, and the court's ruling at this time concerns itself solely with the sufficiency of the pleadings, i. e., the allegations of the complaint, and not upon the facts as they may be proved, or any facts disclosed in any discovery procedure already undertaken by the parties.

*Antitrust Violations—(a) Monopoly*

 Section 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, 3, "is not restricted to conspiracies or combinations to monopolize but also makes it a crime for any person to monopolize or attempt to monopolize any part of interstate * * * commerce. So it is that monopoly power, whether lawfully or unlawfully acquired, may itself constitute an evil and stand condemned under § 2 even though it remains unexercised. For § 2 of the Act is aimed, *inter alia*, at the acquisition or retention of effective market control. * * * Hence the existence of power 'to exclude competition when it is desired to do so' is itself a violation of § 2, provided it is coupled with the purpose or intent to exercise that power. American Tobacco Co. v. United States, 328 U.S. 781, 809, 811, 814 [66 S.Ct. 1125, 1139, 1140, 1141, 90 L.Ed. 1575)." [20]

Plaintiff devoted many pages in stating that for some 10 years before Continental acquired Love's Hawaii, Love's Hawaii had the same 83% monopoly of the bread and bread-type rolls market in Honolulu of which plaintiff now complains and that during such period, because of its monopoly, it possessed the power and ability to set prices of bread products in the Honolulu market, and under Love's Hawaii's "suffocation" policy its prices during such pre-acquisition years were fixed so low that the plaintiff and the other four competing bakeries could neither undersell nor price higher than Love's Hawaii and still remain in business.

 From the allegations, it appears with certainty that Love's Hawaii had what a layman would call a monopoly of the bread and bread-type rolls market in Honolulu. While contradictory *theories* of recovery may be alleged under the rules, the court may nevertheless take cognizance of contradictory *facts* set forth in the pleading, and this court notes that in 1959 and during the preceding some 15 years, the plaintiff had made good profits and considered that business prospects were bright—even in the face of the alleged "suffocation" practices of Love's. From the pleadings, therefore, it is a logical inference that Love's Hawaii had achieved its monopolistic position by honest industry or by virtue of superior skill, foresight and industry, and

16. Flinkote v. Lysfjord, 246 F.2d 368, 396 (9th Cir. 1957).

17. Independent Iron Works Inc. v. United States Steel Corp., 322 F.2d 656, 673 (9th Cir. 1963).

18. America Crystal Sugar Co. v. Cuban-American S. Co., 259 F.2d 524 (2nd Cir. 1958).

19. Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725, 728 note 3 (8th Cir. 1964) and cases cited therein.

20. United States v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948).

the facts alleged do not show violation of § 3 of the Sherman Act.

■ Mere size, nor continued exercise of lawful powers by even a monopolist, is not illegal when that size and power have been obtained by lawful means and developed by natural growth.[21] "It would be paradoxical for government * * * to encourage a race for the swift and then reward the victor with a sentence of economic death."[22] Under the economic conditions extant in the United States today, bigness is not *per se* illegal—it is here to stay and "the supermarket is not going to be replaced by the small mom-and-pop grocery stores which is superceded."[23]

■ Monopolies coming about through non-predatory, nonexclusionary and essentially fair competitive practices are not ipso facto condemned,[24] i. e., through aggressive merchandizing, and employing vigorous but nevertheless honest oconomic maneuvers to enlarge its market position. What is condemned its growth by business methods designed for and having the effect of impeding new entry into the market, or excluding those whose occupancy is already precarious, by recognizably exclusionary devices.[25] Competing fairly and aggressively, regardless of the consequences to one's rivals is not condemned.

■ The Sherman Act does not make mere size nor continued exercise of its lawful power an offense, when that size and power have been obtained by lawful means and developed by natural growth

—absent the *manifest* purpose or intent to exclude competition.[26]

The indicia of continued monopolization are the existence of either the power or the intent to exclude competition or fix prices. The possession of monopoly power is something other than the status in a market of a dominant firm. The dominant firm may have neither the power to exclude competitors, nor the power to fix prices.[27]

Even though Continental was subject to control under the Federal Trade Commission, nevertheless, subject to possible FTC or private contra action, it was free to enter the Honolulu market. However, it was prohibited from using in the Honolulu market the "inanimate market power" it already enjoyed—"market power" meaning the power to control prices or production in the new Honolulu market. Jurisdiction over prices and power to exclude are prohibited but not decisive of the existence of monopoly power. It would be paradoxical to encourage competitive efforts in a market and then if through unusual and superior skill, foresight and industry in production and marketing, one firm develops undisputed mastery in the market it should [therefore] be sentenced to economic death.[28]

*Antitrust Violations—(b) Conspiracy to Monopolize*

Plaintiff's broad allegations that the acquisition of Love's Hawaii with its existing monopoly power by the national giant Continental, then under FTC con-

21. United States v. United States Steel Corp., 251 U.S. 417, 223 F. 55, 64 L.Ed. 343 (1920). United States v. International Harvester Co., 274 U.S. 693, 47 S.Ct. 748, 71 L.Ed. 1302 (1927).

22. Handler: Some Unresolved Problems of Antitrust, 62 Columbia L.Rev., 930, 933.

23. Supra note 22, id. at 952.

24. United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 341 (D.Mass. 1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

25. United States v. Aluminum Co. of America, 148 F.2d 416, 430 (2nd Cir. 1945); and supra note 24.

26. United States v. United States Steel Corp., supra note 21; United States v. International Harvester, supra note 21; United States v. Aluminum Co., of America, supra note 25.

27. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

28. United States v. Aluminum Co. of America, supra note 25. Cf. Handler, supra note 22.

trol, was unlawful, is inferentially negated by the fact that the FTC took no action to restrain the merger.

Aside from the fact that each baked bread, no allegation factually indicates that there was any competition between the "merger partners", Continental and Love's Hawaii, (Sherman § 1; cf. United States v. First National Bank, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964), nor that Continental ever made any effort to enter the Hawaiian markets before its acquisition of Love's Hawaii. Cf. United States v. El Paso Natural Gas Co., 377 U.S. 651, 84 S.Ct. 1044, 12 L.Ed. 2d 12 (1964). The merger here was not illegal *per se* under the Sherman Act.

Nevertheless, common ownership or control of two "conspiring corporations" does not liberate them from the impact of the antitrust laws.[29] Even though a conspiracy be alleged, there still remains the question of whether the "arrangement" manifests unreasonable restraint of trade or a lawful means of carrying on competition in trade.

A mere agreement between parent and subsidiary corporations to attempt to restrain competition by lawful means is not sufficient to condemn it, unless such agreement sets up a *per se* violation situation.[30]

A monopoly in a "market does not of itself impose restrictions on one who actively, but fairly, competes for it * * *. [T]here must be some affirmative showing of conduct from which a wrongful intent can be inferred." If the monopolist resorts to any unfair practice with an intent to restrain commerce, or to monopolize, and does not confine itself to skill, foresight and industry in improving or maintaining its market position, such practice is condemned, but if its practices were intended only to resist deterioration of its own position,

such practices should not be construed as unfair, within the Sherman Act.[31]

Plaintiff's repeated allegations of the defendants' intent, viz., to keep out mainland competition, to forestall supermarkets from having their own bakeries, and to maintain . Love's own position in the market, does not itself state an intent evil *per se*. This court can judicially notice that business practice both here and on the mainland under the American competitive scheme, is for a business entity to build up its own profits and, in order to insure such profits, not to take acts which will invite new competitors in the market area or leave its own business vulnerable to raids by firms that can produce the same products at lower costs.

Plaintiff here has repeatedly alleged that the intent of "Love's Hawaii's suffocation plan" (continued on by Love's after acquisition by Continental) was to (1) keep out competition from large mainland baking companies which might wish to invade the Hawaiian market, (2) prevent supermarkets from opening up their own bakeries, and (3) to maintain a monopoly. There is nothing illegal *per se* in the charged intent; such intents are to be found in the minds of every manufacturer in Hawaii with a plant built up and geared to a certain volume of production. Each and every business must aggressively resist encroachment upon the markets for its products or fall behind in the economic race. Again, therefore, the facts pleaded must be analyzed to see if any alleged acts, separately or in combination with others, add up to proscribed and unlawful competitive practices.

Here, all of plaintiff's allegations concerning "the $500,000 machine" purchased and put into operation by Love's Hawaii, Love's retail sales at the

---

29. Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

30. Northern Pac. R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

31. Union Leader Corp. v. Newspapers of New England, Inc., 284 F.2d 582, 584 (1st Cir. 1960).

bakery, its supplying of racks to supermarkets, and aggressive actions of its bread salesmen in pushing Love's bread in the supermarkets, the new advertising and sales techniques, business and bakery advice supplied by Continental to Love's, do not separately or in total become unfair business practices condemned under the antitrust acts.

The Aluminum and United Shoe cases, supra, apparently condemned growth by business methods designed for and having the effect of impeding any entry into a market or excluding those whose occupancy is already precarious, by recognizably exclusionary devices.[32] Within the allegations of conspiracy to monopolize, we must also concern ourselves with whether the plaintiff alleged facts showing that Continental used in the Honolulu market its mainland market power to any substantial extent or whether by operating in the Honolulu market it increased its mainland market power.

### Market Power—"Wonder Loaf" and New Breads

■■■ Plaintiff alleges Continental's "Wonder" brand name on a round sandwich loaf was used specifically to compete with plaintiff's own similar loaf. Since plaintiff further alleges that this not abnormal competitive gambit was accompanied by such excessive advertising expenses as gives rise to an inference of an agreement between Continental and Love's to use Continental's "market power" to achieve an unfair competitive advantage, a Sherman Act violation is thereby alleged.

■■■ It appears possible that there remains an unsettled issue of fact in the allegations contained in pages 37–39 of the complaint concerning the 13 new breads introduced into the market between May 1960 and May 1962. If, as pled, these were introduced and accompanied with excessive advertising costs for the purpose of destroying competition, and it could be shown that the costs of such advertising were as extravagant as alleged, i. e., that the defendants' "market power" was applied, and if there was no factor which could justify such expenditures as fair economic necessities, then from such facts the proscribed intent to destroy competition might be found, i. e., a Sherman Act violation.

### Price Fixing

Price fixing is alleged from two aspects, viz., (1) Love's Hawaii and subsequently Love's, conspiring with Continental, maintained its Honolulu bread prices some 3¢ per loaf below comparative mainland prices, and (2) Love's imprinted the retail price on its loaves.

"Price fixing" is an ominous phrase in antitrust suits.

■■■ Under the Sherman Act, price fixing means a combination or conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate commerce.[33] The test is not what the actual effect is on prices, but whether such agreements interfere with the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment.[34] Any such conspiracy to fix prices is unreasonable per se.

■■■ Careful and studious consideration of the cases involving "per se illegality" in the price fixing field,[35] none of which bears factual resemblance to the instant situation, convinces this

32. Cf. United States v. Besser Mfg. Co., 96 F.Supp. 304 (E.D.Mich.1951), aff'd 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063 (1952) ; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).

33. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

34. Kiefer-Stewart Co. v. Joseph E. Segram & Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951). Cf. Plymouth Dealers Ass'n of No. Cal. v. United States, 279 F.2d 128 (9th Cir. 1960).

35. Northern Pac. R. Co. v. United States, supra note 30, and American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

court that the principle has no application here. Absent the *per se* illegality doctrine, in determining whether an alleged restraint is unreasonable and therefore illegal and violative of the Sherman Act, resort must be had to the rule of reason. This rule, founded in 1911, in Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 and followed in United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 386, 76 S.Ct. 994, 100 L.Ed.2d 1264 (1956), draws the line between zones of legal and illegal conduct under the anti-trust laws by consideration of all of the factors and circumstances in any given situation. It permits consideration and analysis of any allegation in relation to the anti-trust issues alleged.

The crucial issue, therefore, is whether the alleged conduct and course of action pursued by the defendants resulted in unreasonable restraint of trade within the prohibition of the Sherman Act.[36] In connection therewith it must also be noted that a combination or agreement for price maintenance or which operated directly on prices or price structure " * * * limited in its objectives to intrastate activities, with no intent or purpose to affect [interstate] commerce, is without the reach of the [Sherman] Act, even though there may be an indirect and insubstantial effect on interstate commerce." [37]

The term "price fixing" thus entails more than keeping local prices lower than those 2000 miles away, or the printing of a price on a loaf of bread. The "price fixers" must have both a leverage and an intent, to the detriment of interstate commerce in the relevant market. The leverage must be such that the buyers in the market are unable to look other than to the fixer for the product sold, and the resultant price fixed was at an arbitrary and noncompetitive basis.[38] A quick review of the cases indicated that the "price fixing" alleged here has no resemblance to that condemned in the Socony-Vacuum (supra note 33) or Parke-Davis cases. There is no allegation that the defendants had any leverage other than the public's demand for their bread. There is likewise no allegation that the price was unreasonable or arbitrary.

This court is not yet ready to say that it is an "outlawed competitive practice" for a local subsidiary of a national corporation to agree with its noncompetitive parent as to what local price should be put on the subsidiary's products in the local market, in the manner here alleged—so long as that price is one at which the subsidiary may make a profit, and absent such factual allegations as were found in Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725 (8th Cir. 1964). Here the only factual allegation is that the prices in the Honolulu market were lower than those on the west coast of the mainland United States. This broad allegation, when coupled with the facts above indicated, is not sufficient to support the claim of "price fixing" within the purview of the Sherman antitrust statutes.

The only other "price fixing" alleged was that Love's printed the price of its bread in large figures on the end of each loaf, and that therefore the retail dealers could not raise the price and the competitors were held to meet the same price. There were no facts alleged indicating that such price, unilaterally fixed by Love's and its parent corporation, basically did anything else but protect the public and keep down the price of bread in the Honolulu market. The word "conspiracy" carries an evil sound,

---

36. Adams Dairy Company v. St. Louis Dairy Company, 260 F.2d 46, 54 (8th Cir. 1958).

37. Frankfort Distilleries v. United States, 144 F.2d 824, 833 (10th Cir. 1944).

38. See United States v. Parke-Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1959).

but the facts supporting the "conspiracy" alleged here failed to show that either the objectives or results were evil *per se*. The plaintiff does not allege that the price as fixed in any way prevented the retailers from handling Love's bread at a profit.

Also, it does not appear that the imprinting of the price on the defendants' loaves of bread deprived the retailers of their right to exercise their own free judgment as to whether to sell defendants' products at all or to sell defendants' products at any price they chose, nor do the facts alleged indicate that the competitors were, by anything other than the normal market competitive "coercions", deprived of their right to set their own prices on their own products. There is no allegation that the imprinted price was below the retailers' costs, or that the wholesale sale price was below plaintiff's or defendants' costs, or that plaintiff or defendants could not make a profit at defendants' wholesale price to the retail outlets, or that the retailers could not make a profit at the imprinted price. Likewise, there is no allegation that the retailers were estopped by any coercive acts of defendants from selling defendants' bread at a higher price. Nowhere do the facts allege any coercion on the retail outlets or competitors to achieve resale price maintenance.

It thus clearly appears that the facts of the "conspiracy to fix prices" by affixing the price to the loaves, as alleged in the complaint, do not manifest a price-fixing "conspiracy." No injury to the public, no injury to the retailer, and no direct and unlawful injury to the competitor who was forced to meet that price were alleged. Plaintiff's only complaint by inference was that the price so fixed did not give the plaintiff the margin of profit the plaintiff might have desired. The sum total of plaintiff's allegations

regarding "price fixing" fall short of showing there was any actual restraint of trade in the bread products market—other than the normal restraint arising from the public's demand for a product and the correlative market demand upon competition that the "fixed price" be met. Such price fixing as here alleged is not condemned by the Sherman Act.

As a correlative to "price fixing", the facts alleged relative to Love's "bid sales" to the Army and Navy, do not show that Love's lost money on such sales or that its success (predating and subsequent to March 1960) in securing the bids involved any unfair competitive actions proscribed under the Sherman Act.

### Conspiracy

█ To establish a violation of either §§ 1 or 2 of the Sherman Act, plaintiff is required to allege facts showing that the unlawful conspiracy had an impact on interstate commerce or because the acts complained of occurred in interstate commerce, or because those acts, though occurring wholly on the local level, substantially affected interstate commerce.[39] "The test of jurisdiction is not that the acts complained of affect the business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business." [40]

█ While the Sherman Act condemns wholly local business restraints affecting interstate commerce, as well as restraints in interstate commerce, the effect of the local restraints on interstate commerce "must be direct and substantial, and not merely inconsequential, remote or fortuitous." [41]

If defendants' acts did substantially burden or prevent competition in the sale of bread products to the airlines and shipping companies, then there might be sufficient effect upon interstate com-

39. Las Vegas Merchant Plumbers Ass'n. v. United States, 210 F.2d 732 (9th Cir. 1954), cert. denied 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954).

40. Page v. Work, 290 F.2d 323, 330, 332 (9th Cir. 1961), cert. denied 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961).

41. Supra note 40.

merce to justify the plaintiff's complaint.[42]

An area in plaintiff's factual allegations which keeps the plaintiff in this court is the allegation that defendants introduced so many new breads, at such tremendous advertising costs, in such a short period of time, and if the plaintiff can prove that the practices and the costs accompanying them were, as alleged, for the purpose of preventing and eliminating competition, and that such acts substantially affected the interstate commerce aspects of the bread products market in the Honolulu area, then it has stated a cause of action.

The facts as alleged by plaintiff here do not show any effort on the part of the defendants to deprive the plaintiff of the necessary supplies for the operation of its business, nor does there appear to be any interference with plaintiff's sales of products either to the retailers or to the Army, Navy, airlines, etc., or direct interference with plaintiff's business in any fashion, or restraint upon the competitive sale of bread products in the market—other than by excessive and excessively expensive advertising and aggressive new bread sales policies.

The question to be answered by this court may thus ultimately be whether or not defendants' practices in the market amounted to an unreasonable restraint of trade within the purview of the Sherman Act.[43] If, as alleged, defendants' excessive advertising, coupled with its new breads, are proved to have been engaged in, solely for the purpose of restraining or foreclosing competition in the bread products market in the Honolulu area, and if those practices are made possible by the leverage given by defendants' monopoly position and/or the "deep pocket" or market position of Continental, then it would appear that there exists an issue of fact which cannot be disposed of on the pleadings hereon.

At this stage, we must again note that this case is still in the pleading stage. While the practices alleged at great length (excessive and expensive advertising with the introduction of new breads, etc.) might be susceptible of two interpretations: 1, superior skill and operational ability, coupled with strong, aggressive action, brought about by constant fear of mainland firms or supermarkets entering the Honolulu market, and solely aimed at maintaining its already acquired position in defendants' share of the market; or 2, basically predatory and aimed at restraining and destroying competition, both potential and local. Since the pleadings allege the 2nd, for the purpose of this motion to dismiss, we must accept the 2nd as the correct interpretation.

This court is not at this point concerned with whether or not plaintiff can prove that these overt acts were carried out with the evil intent alleged. Since this issue of fact remains, this court at this time will not summarily dismiss the Count II on pleadings alone.

Defendants' motion to dismiss Count I is granted.

Defendants' motion to dismiss Count II is denied.

Defendants are given twenty (20) days from the date hereof to answer, or otherwise plead.

42. Cf. United States v. Yellow Cab Co., 332 U.S. 218, 233 67 S.Ct. 1560, 91 L.Ed. 2010 (1947).

43. See Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2nd Cir. 1964).