**CALNETICS CORPORATION,**
**Plaintiff,**

v.

**VOLKSWAGEN OF AMERICA, INC.,**
**et al., Defendants.**

**No. 70–2185.**

United States District Court,
C. D. California.

June 30, 1972.

---

3. In light of the affidavit of Mr. Yokeley, the spent shotgun shell was clearly evidence of an incriminating character.

608

Blecher & Collins, Maxwell M. Blecher, Harold R. Collins, Jr., Gary W. Hoecker, Los Angeles, Cal., Gottlieb & Schwartz, Bernard Weisberg, Melvin E. Pearl, Chicago, Ill., for plaintiff.

Harry B. Swerdlow, Allan Albala, Swerdlow, Glikbarg & Shimer, Beverly Hills, Cal., for Volkswagen of America, Inc.

Sandler & Rosen, Raymond C. Sandler, Nelson Rosen, Los Angeles, Cal., for Volkswagen Pacific, Inc.

## MEMORANDUM OPINION AND ORDER

REAL, District Judge.

This matter comes on for decision after trial by jury of damages claimed by plaintiff against defendants as the result of alleged violations of Section 7 of the Clayton Act [15 U.S.C. § 18], and trial to the court sitting without a jury to compel a divestiture of the acquisition of Delanair Engineering Co., Inc. by

Volkswagen of America, Inc., on September 26, 1969.

## THE PARTIES

Plaintiff Calnetics Corporation (hereinafter referred to as Calnetics) is a California corporation operating a group of related divisions engaged in the businesses of manufacturing and selling air conditioners, components and parts thereof, sheet metal fabrication, tool and part machinery, and plastic moldings and extrusions. Plaintiff is the successor in interest to Sudmeier Engineering Corporation. Plaintiff complains here of antitrust violations affecting its Meier-Line division in the manufacture and sale of air conditioners, components and parts thereof, for use in Volkswagen automobiles.

Defendants are various entities engaged in the distribution of Volkswagen automobiles within the United States. Defendant Volkswagen of America, Inc. (hereinafter referred to as VWoA) is a New Jersey corporation. It is a wholly owned subsidiary of Volkswagen Werk A.G., a German corporation, the manufacturer of Volkswagen automobiles in Germany. VWoA imports Volkswagen, Porsche and Audi automobiles into the United States for sale through fourteen distributorships set up regionally throughout the United States. Five of these distributorships are wholly owned subsidiaries of VWoA. The remaining nine are independently owned and operated.

Volkswagen Pacific, Inc., a California corporation (hereinafter referred to as VPI), is an independently owned and operated distributor of Volkswagen, Porsche and Audi automobiles in Southern California, Southern Nevada, Arizona and Hawaii.

Volkswagen Products, Inc., a Texas corporation (hereinafter referred to as VPC), is the successor in interest to Delanair Engineering Co., Inc. (hereinafter referred to as Delanair). Delanair and its successor VPC have engaged in the manufacture and sale of air conditioners, components and parts thereof, for use in automobiles. Delanair was acquired by VWoA on September 26, 1969, as a wholly owned subsidiary, and has with its change of name to VPC remained so during all times material to this litigation. It is this acquisition which brings the parties before the court.

Other parties are brought before the court by way of counterclaim on behalf of VWoA but are not necessary to the issues to be decided herein and are therefore omitted from identification as parties.

## THE LITIGATION

This litigation was commenced by the filing of a complaint by Calnetics on September 28, 1970 charging defendants VWoA, VPI and VPC with violations of Sections 1 and 2 of the Sherman Act [15 U.S.C. §§ 1, 2] and defendant VWoA with violation of Section 7 of the Clayton Act [15 U.S.C. § 18]. Plaintiff sought damages and injunctive relief resulting from the claimed violations of the antitrust laws of the United States.

During the pretrial proceedings of the action, the Court, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, severed the claimed violation of Section 7 of the Clayton Act [15 U.S.C. § 18] and the matter proceeded to trial against defendant VWoA upon those claims alone, reserving the remaining claimed violations of Sections 1 and 2 of the Sherman Act [15 U.S.C. §§ 1, 2] for later trial.

Defendants' alleged violation of Section 7 of the Clayton Act [15 U.S.C. § 18] is alleged to have damaged plaintiff by substantially lessening competition and tending to create a monopoly in the manufacture, distribution and sale of air conditioning systems for Volkswagen, Karmann Ghia and Porsche automobiles and the foreclosure of that market to plaintiff. The relationship created by the acquisition of Delanair by VWoA is claimed to destroy incentive to compete and deter new entry into the line of commerce foreclosed to plaintiff. The claim for damages proceeded to trial before the Court sitting with a jury and resulted in

a judgment for directed verdict for defendant pursuant to Rule 50(a).

Proceeding without a jury the Court heard further evidence upon the equitable relief claims of plaintiff. After the completion of the evidence and summation of counsel, the Court submitted the matter for decision.

## THE ISSUES

1. Does plaintiff have a claim for treble damages and/or injunctive relief for claimed violations of Section 7 of the Clayton Act?

2. What constitutes the line of commerce or product market?

3. What is the geographic territory or section of the country involved?

4. Does the acquisition of Delanair by VWoA violate Section 7 of the Clayton Act?

5. Is the proffered "failing company" defense available to defendant VWoA?

## THE FACTS

The Calnetics story commences, for the purposes of this litigation, with the increasing recognition during the 1960s of a need for an air conditioner compatible to Volkswagen automobiles with their low horsepower and rear-mounted air-cooled engines.

Calnetics in its Meier-Line division completed its development in 1967 in what it considered a unique air conditioner compatible to low horsepowered automobiles. This development, so far as Calnetics was concerned, was limited to a compressor unit and clutch assembly designed to minimize the horsepower drawn from the automobile engine. All other parts of the air conditioner marketed by Calnetics were standard items available from manufacturers engaged in the business of marketing components and parts in the general air conditioner field. Calnetics was then an assembler of standard parts into an air conditioning unit adaptable to low horsepower automobiles of foreign and domestic manufacture. Calnetics, however, chose during 1967 and 1968 [1] to limit itself to manufacture (in the assembly aspect of manufacturing) of air conditioning units for the Type I automobile in the Volkswagen family.[2] This limitation resulted from two factors—1. the limited production facilities of Calnetics,[3] and 2. a recognition that Volkswagen automobile owners represented the best available market to exploit this new development in automobile air conditioning.

■ Competitively, Calnetics entered a market then (1967–68) being supplied by Delanair and DPD [4] with very negligible market intrusions in various Volkswagen and Porsche models by ARA, Parkomat, Novi, Behr and Coolaire. The marketing potential [5] as recognized and exploited by Calnetics in these early stages of production was twofold—1. independent distributors of automotive products,[6] and 2. Volkswagen dealers franchised by VPI to sell the Volkswagen family of automobiles within the VPI territory. In addition to these markets, Calnetics through its then president Wil-

---

1. In 1967 Calnetics sold 317 units and in 1968 sales amounted to 988 units.

2. The Volkswagen family of automobiles include Type I—the commonly referred to "bug" or "beetle" and Karmann Ghia; Type II—the bus or van; Type III—the fastback or squareback; Porsche 911; and Porsche 912.

3. Production capacity was limited to 2 units per day.

4. 1967: Delanair sold 23,620 units accounting for 85.5% of the market. DPD sold 3700 units accounting for 13.4% of the market.

1968: Delanair sold 37,127 units accounting for 82.3% of the market. DPD sold 7000 units accounting for 15.5% of the market.

5. At one time it was estimated that there were 1,250,000 Volkswagen Type I automobiles on the road without air conditioning.

6. These independent automotive products distributors sold directly to a purchaser of a Volkswagen automobile or in some instances to Volkswagen dealers for dealer installation of the air conditioner in a Volkswagen automobile.

liam Sachko was undertaking activities [7] which would in late 1968 result in the entire production of Calnetics being assigned to VPI directly for distribution to Volkswagen dealers in the VPI marketing area. Mr. Sachko's machinations brought Calnetics to the position as the exclusive supplier for VPI and lost to Calnetics the future potential of marketing its air conditioners with independent automotive accessory distributors. The sales efforts [8] of then Sales Manager (and later President) of the Meier-Line division of Calnetics, Mr. Charles Howseman, were completely nullified by Mr. Sachko. All of these negotiations with VPI were carried on by Mr. Sachko without consultation with Mr. Howseman.

In 1969 Calnetics, now armed with an exclusive VPI contract, moved to a new production facility and began full production in June of that year to meet the demands being made upon it by VPI. Increases were in fashion. Production increased, sales increased [9] and so did the problems, both financial and quality of product. Warranty claims and dealer complaints reached such a point that by the time production facilities had been developed to the capacity of the anticipated potential of increased sales, VPI was compelled to, and did begin to offer both DPD and Meier-Line air conditioners to its Volkswagen dealers. DPD's competitive intrusion into the VPI territory was not only aided by Calnetics' failures but also with the quality problems being simultaneously experienced by Delanair.

Delanair's story is equally interesting. Delanair started its existence sometime prior to 1963 as a division of Overseas Motors Corporation of Fort Worth, Texas, manufacturing air conditioning units as an add-on [10] primarily for Jaguar, Rolls-Royce and Volkswagen automobiles. Sometime in 1963 a British Company, Delaney-Galley, became interested in and did acquire the air conditioner manufacturing division of Overseas Motors and incorporated Delanair Engineering Co., Inc. as a subsidiary of Delaney-Galley to succeed to the business of this division. Though the acquisition by Delaney-Galley was to obtain expertise in the air conditioning field, it soon found itself with an operating and profitable [11] business in the United States. Because of restrictions by the British government of the export of money,[12] the financing of Delanair's operations was accomplished by United States bank loans guaranteed by Lindustries, Ltd., the British parent corporation of Delaney-Galley. That guarantee extended a line of credit to Delanair in the sum of $1,500,000.

Delanair in 1968 experienced sales of 37,127 air conditioning units for Volkswagen and Porsche automobiles. These sales were accomplished through VWoA,

---

7. These activities included the negotiation and execution of an agreement with Rolf W. Christiansen, parts service manager for VPI, to pay R.W.C. Sales Corporation (owned by Christiansen and Philip Ballingal, his assistant) a commission of 3% of the gross sales of air conditioners, components and parts thereof to VPI. Rolf W. Christiansen was described during the trial as "a dominating factor in the selection of Meier-Line air conditioners purchased by Volkswagen Pacific."

The sales so made cannot be excluded for purposes of determining a total market for Section 7 considerations, but because of the source are excludable in any consideration of the damage issue presented by Calnetics.

8. Mr. Howseman had negotiated distribution agreements with several independent distributors of automobile accessories throughout California which in November 1968 were unilaterally cancelled by Calnetics.

9. 1969 sales for Calnetics amounted to 4,134 units sold exclusively to VPI.

10. An "add-on" unit is one not designed for installation as an integral part of the design configuration of an automobile.

11. Delanair gross sales for 1967 were $4,213,000. In 1968 gross sales jumped to $7,248,000. During these years Delanair accounted for more than 40% of the total sales of Delaney-Galley.

12. An English company was required to pay a 26% penalty for the export of money from England, i. e., every dollar sent from England actually cost the English company $1.26.

who had by that time become Delanair's only customer.[13] But like Calnetics, quality problems increased throughout the spring and summer of 1968. During 1968 VPI ceased to purchase Delanair air conditioners from VWoA and substituted DPD. Later Meier-Line was added and eventually became the primary line of VPI air conditioner offerings.

By June of 1969 the problems had reached such proportions that in the advent of the air-conditioning season [14] of 1969 sales had come to a virtual standstill. Recognizing the acute nature of the problems being experienced the president of Delaney-Galley was commuting monthly from England to Fort Worth, Texas during late 1968 and 1969. Buying management and technical knowhow in 1963, Delaney-Galley now found it necessary to relieve the president, production manager and quality control manager of their duties with Delanair in March 1969. VWoA was enlisted in a sales campaign to bolster the sagging finances of Delanair. On July 14, 1969 VWoA was approached—with negative results—in an effort to alleviate the problem by urging the purchase of Delanair by VWoA.

Faced with the reality of curtailed income which would require Delaney-Galley and/or Lindustries, its parent company, to provide cash or further credit [15] by American financial institutions to meet impending calls on $1,300,000 in obligations to the Fort Worth National Bank and operating capital to weather the crisis, Mr. Dennis Harwood-Jones,

the president of Delaney-Galley recommended to his Board of Directors the sale of the Delanair subsidiary.[16] Reciting these enumerated reasons, Mr. Harwood-Jones, in total candor, further testified at the trial:

"We had no desire to have a manufacturing operation of this size in the American market. We initially set out to acquire the knowledge for our own use in England and to enable us to manufacture a satisfactory unit to the American comfort standard for American automobile manufacturers to add to their vehicles on the production line.

"We had no desire to indulge in an after market type of unit, and the fact that we had acquired this knowledge and were already achieving a capability, had been satisfied, and was a major point in determining to sell this company."

Given the responsibility of selling Delanair before the end of the then current trading year.[17] Mr. Harwood-Jones first approached DPD as the most likely company to be interested in the acquisition. On July 24, 1969 DPD Company evidenced by letter its intent to purchase Delanair, the purchase to be closed September 1, 1969. This agreement temporarily ended the search for a buyer.

During August 1969 DPD attempted, unsuccessfully, to conclude financial arrangements [18] which would permit the purchase to be accomplished on September 1, 1969. The date was extended

---

13. In the year ending September 28, 1968 VWoA accounted for 97% of the sales of Delanair. VWoA in turn offered for sale these air conditioners to Volkswagen distributors, both independent and its own subsidiaries throughout the United States.

14. The air-conditioning season is generally considered in the automobile industry to peak from May to October.

15. There was no question that Lindustries had the capability to provide the needed capital (estimated at $450,000) to continue the operations of Delanair. In 1969 Lindustries had total gross revenues

of about $65,000,000 and Delaney–Galley about $15,000,000.

16. Mr. Harwood-Jones reported to his Board of Directors anticipated losses of $800,000—$1,000,000 and a likelihood that Delanair would not be able to meet current commitments to creditors.

17. September 27, 1969.

18. Most important of these financial arrangements was $100,000 cash and discharge of the liability of Lindustries upon the $1,300,000 obligation at the Fort Worth National Bank.

to September 15, 1969, but giving Delaney-Galley the option to look for purchasers elsewhere. Mr. Harwood-Jones then approached John Stuart Perkins, President of VWoA, requesting financing of Delanair by VWoA. The response of VWoA was negative.

Still attempting to meet his deadline, Mr. Harwood-Jones approached Lone Star Engineering Company, Fort Worth, Texas, and Behr, a manufacturer of air conditioners in Stuttgart, Germany, each with negative results. The asking price in these negotiations was between $750,000 and $1,000,000 and assumption of Bank of Fort Worth liability of $1,300,000 based upon Mr. Harwood-Jones' appraisal of the potential of Delanair as an operating company. With the reluctance, but not the inability, of Delaney-Galley to aid its subsidiary financially during these times, the creditors were requested and unanimously cooperated to a delay in the payment of the current obligations due them from Delanair. Heatransfer, a new entry into the field of automobile air conditioning, was discounted as a potential buyer because of disapproval by Delaney-Galley of the Heatransfer method of cooling over the back of the automobile.

While these latter negotiations were being pursued, Delaney-Galley continued its efforts to sell Delanair to VWoA.

During his trip to Frankfort, Germany to contact Behr, Mr. Harwood-Jones again talked to Mr. Perkins and now elicited some personal interest from him. The discussions were continued in London, England and on September 24, 1969 the discussions were continued at the home offices of VWoA in Englewood Cliffs, New Jersey. With three days of negotiations the persuasion was irresistible and on September 26, 1969 the acquisition of Delanair by VWoA became a reality. Almost immediately Delanair became VPC and VWoA now had, within its own organization, the manufacturing capability to supply its channels of distribution of air conditioners for its automobiles.

With new management,[19] new financing,[20] new name,[21] and intensive sales effort,[22] VPC began the climb back in dominance of the competitive Volkswagen air conditioner market. From the low 1969 market position—24,149 and 52.4% of the Volkswagen air conditioner market—the dramatics of the acquisition was evidenced in 1971 when 68,211 units or 71.0% of the market were VPC sales. In less than two years VPC had not only completely eliminated Calnetics as a competitor in VPI's procurement of Volkswagen automobile air conditioners but had made significant impact on the competitive positions of DPD, Heatransfer and Coolaire.[23]

19. A product of Volkswagen organizational training from 1950, Mr. Gerold Fray Schlager was transferred from Volkswagen Southeastern Distributor, Incorporated, a subsidiary of VWoA and installed as Vice President and General Manager of VPC.

20. VWoA advanced interest-free to VPC the sum of $545,000.

21. The name Delanair was changed to VPC. Delanair like Meier-Line were names that had reached the brink of anathema in the Volkswagen automobile air conditioning field.

22. Demonstrative of the intensity of sales effort by VWoA are the discussion of Mr. John Stuart Perkins, President of VWoA and Guenter Kittel, Vice President—Parts Manager of VWoA, which prompted Mr. Kittel to memorialize as:

" . . . Mr. Weill promised that he will join our marketing efforts . . . . ".

The Mr. Weill referred to is Mr. Samuel Weill, Jr., President of VPI.

Concurrently with the acquisition—September 26, 1969—all Volkswagen distributors in the United States were informed with the announcement of a 1970 modified version of Type I and Type III air conditioners by Mr. John Stuart Perkins, President of VWoA.

Announcements were made that Volkswagen was in the air conditioning business.

More significantly, this market reversal was accomplished with little, if any, improvement in the air conditioner produced by Delanair in 1968 and 1969.

23. Between 1970 and 1971 (the first year of effective operation of the VPC manu-

Recognizing the competitive realities of the loss of exclusivity of the VPI market and the limited funds available to it, Calnetics turned to a search for new—and the recapture of old—customers. Increasing the scope of its product line Calnetics with its limited resources—attempted to capture, in some degree, the air conditioner market for all compact automobiles of both foreign and domestic manufacture.[24] The summer of 1969 was too hot for Calnetics air conditioning endeavors and on December 4, 1969 Calnetics met its creditors to review its operating status and attempt to stave off bankruptcy, voluntarily or involuntarily threatening it. These efforts have been successful and Calnetics remained sufficiently viable at the time of trial to continue its competitive efforts on a curtailed basis selling air conditioners for Volkswagen automobiles.

With these facts as some background of the litigative stance of the parties, the Court now proceeds to determination of the issues presented.

■ 1. Standing of Plaintiff.

Corporate mergers and acquisitions are proscribed in the anticompetitive sense by Section 7 of the Clayton Act [15 U.S.C. § 18] which provides in its pertinent part:

"§ 18. Acquisition by one corporation of stock of another.

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . of another corporation, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

VWoA proposes as a threshold issue the standing of Calnetics to maintain a suit either for damages or injunctive relief (divestiture) for alleged violation of

Section 7 of the Clayton Act [15 U.S.C. § 18].

Early in its consideration of antitrust legislation, the Congress provided a remedy to those private individuals damaged by reason of antitrust violations. The surviving treble damage remedy is found in Section 4 of the Clayton Act [15 U.S.C. § 15] which provides in its pertinent part:

"§ 15. Suits by persons injured; amount of recovery.

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . ."

Concurrently with this final enactment of the treble damage provision of the Clayton Act, which has survived since 1914, the Congress recognized that damages did not provide a totality of relief necessary to curb the lasting effects of continued anticompetitive conduct and enacted Section 16 of the Clayton Act [15 U.S.C. § 26] to provide for equitable relief in appropriate cases brought by private individuals. It provides in its pertinent part:

"26. Injunctive relief for private parties; exception.

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by violation of the antitrust laws, including section[s] . . . 18, . . . of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . ."

The history of private litigation in antitrust matters has created a plethora of unquestioned authority in the area of

---

facturing facility—market position reductions—DPD from 36.9% in 1970 to 26.0% in 1971—Meier-Line (Calnetics) from 3.-5% to .4%—Heatransfer from 7.3% to 2.3%—Coolaire from .5% to .3%—were significant.

24. Calnetics holds itself out as having the capacity to produce air conditioners for Volkswagen, Porsche 911 and 912, Toyota Corona, Toyota Corolla, Toyota Mark II, Vega, Opel and Pinto.

Sherman Act violations. But in spite of the clear language of both Section 4 [15 U.S.C. § 15] and Section 16 [15 U.S.C. § 26] of the Clayton Act, defendants have, with some modicum of success, convinced courts that there exists no private right to maintain an action for damages suffered or equitable relief required from alleged violation of Section 7 of the Clayton Act [15 U.S.C. § 18]. VWoA here urges upon the Court the same position. Scrutiny of the decided cases, however, indicates that this contention is neither persuasive nor compelling.

In Continental Securities Co. v. Michigan Cent. R. Co., 16 F.2d 378 at page 379 (6th Cir. 1926), cert. denied, 274 U.S. 741, 47 S.Ct. 587, 71 L.Ed. 1320, the court does say in clear and explicit language:

"It is now settled that a private suitor cannot invoke the aid of a court of equity to enjoin a violation of the Sherman Anti-Trust Act . . . .

"The plaintiff gets no help from the Clayton Act. . . ."

But, the later explanation by the court makes clear that the status of the plaintiff as a stockholder was its prime concern. In proscribing a derivative claim by a stockholder to preclude recovery for antitrust injury to his corporation, the court says:

"The other reason is that the favor of section 16 extends only to injunc-tive relief to be given to 'any person * * * against threatened loss or damage.' This is not appropriate language to reach such a suit as this, in which a stockholder files a representative suit, and apprehends no 'threatened loss or damage' save that which comes through the damage to his corporation. . . ."

American Commercial Barge Lines Company et al. v. Eastern Gas and Fuel Associates et al., 204 F.Supp. 451 (S.D. Ohio 1962) merely as a conclusion of law without further authority says:

"5. An action cannot properly be brought by a private litigant under Section 16 of the Clayton Act, 15 U.S.C.A. § 26 for divestiture of assets allegedly acquired in violation of the antitrust laws."

In view of the clear language of Section 26 that "any person . . . shall be entitled to sue for and have injunctive relief" the only rational reading of *American Commercial Barge Company, supra,* would lead to the conclusion that the court was concerned with primary jurisdiction of the Interstate Commerce Commission and applied the exception provided in Section 16 proscribing private suit in matters within the jurisdiction of the Interstate Commerce Commission.

Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725 (8th Cir. 1964) [25] note 3 [26] at page 728 evinces

---

25. See the prologue and epilogue in 221 F.Supp. 15 (E.D.Mo.1963) and 238 F.Supp. 561 (E.D.Mo.1965) respectively.

26. Note 3 says:
"3. We think that any effort to convert Section 7 of the Clayton Act into a *per se* violation of the anti-trust laws so as to give rise to a private right of action under the Clayton Act has been squarely checked by what is said by Mr. Chief Justice Warren in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510. As interpreted in that case, Section 7 of the Clayton Act does not condemn all mergers, but only those having demonstrable anti-competitive effects. The statute deals with clearcut menaces to competi-tion, not with accomplished monopolies, presently creating damage to a competitor, which is a *sine qua non* of a private right of action under Section 5 of the Clayton Act.

Section 7 of the Clayton Act was intended to supplement the Sherman Act and:

'primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending upon the circumstances of the particular case.'

United States v. [E. I.] duPont [De Nemours] & Co., 353 U.S. 586 at 597, 77 S.Ct. 872, 1 L.Ed.2d 1057. See this same case, 366 U.S. 316, 325–329, 81

a concern of the court in the kind of injury that a private litigant must show rather than a lack of available relief. The decision of the case is made, not on the absence of a private right, but upon the fact that the trial court had erroneously applied the statute of limitations to a single act of "acquisition" or "price-cutting" rather than as a course of conduct.

Limiting its consideration, and relying upon the analysis of Judge Pence in Bailey's Bakery, Ltd. v. Continental Baking Company, 235 F.Supp. 705 (D. Hawaii 1964), the court in Isidor Weinstein Investment Co. v. Hearst Corporation, 303 F.Supp. 646 (N.D.Cal.1969) precluded a claim for money damages for alleged violation of Section 7 of the Clayton Act [15 U.S.C. § 18]. The language quoted from *Bailey, supra,* 303 F.Supp. at page 650, is significant:

". . . In Bailey's . . . District Judge Martin Pence stated:

Since Clayton § 7 is concerned with the future monopolistic and restraining tendencies of corporate acquisition, i. e., probable (and hence not certain) future restraints on commerce, any damages claimed for prospective restraint of trade would be purely speculative, and a plaintiff cannot recover money damages for anticipated but unimplemented acts of restraint which may invade its interests. *While Clayton § 7 permits private injunctive and divestiture actions* in merger situations which may result in the proscribed restraints or monopolies, nevertheless, no private action for treble damages accrues

from a Clayton § 7 acquisition. . . ." (Emphasis ours.)

Judge Pence was postulating the difficult and, to him, legally impossible task of proof of causal connection between an acquisition and claimed damage of a competitor. The recognition of available injunctive relief is clear. Interestingly enough, five years later, recognizing the error and reminded by the admonition of Mr. Justice Frankfurter,[27] Judge Pence recants in Kirihara v. Bendix Corporation, 306 F.Supp. 72 (D.Hawaii 1969) and concludes at page 88:

. . . [T]his court is *now* convinced that to hold that Congress never intended the deterrent effect of § 4 to have any application to acquisitions which might violate § 7 upon completion, would absolutely negate the contrary inference which must be drawn from the fact that Congress has left § 4 unchanged and uncircumscribed since 1914. This court now concludes that it threw too wide a loop when it said in 1964: 'No private action for treble damages accrues from a Clayton § 7 acquisition.' 235 F.Supp. at 717.[28]

Reading the clear language of Sections 4 [15 U.S.C. § 15] and 16 [15 U.S.C. § 26] of the Clayton Act and reviewing the comprehensive analysis of *Kirihara, supra,* pp. 80–88 compels the conclusion that Calnetics is properly before the Court in its damage claims and its request for injunctive relief required by the acquisition of Delanair by VWoA in violation of Section 7 of the Clayton Act [15 U.S.C. § 18].

S.Ct. 1243, 6 L.Ed.2d 318. That no private right of action accrues from such a violation, see: Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656 (9 Cir. 1963); United States v. Continental Can Co., D.C., 217 F.Supp. 761, 767 [S.D.N.Y.] (1963); United States v. Ingersoll-Rand Co., et al., 218 F.Supp. 530 (W.D. Penna.1963), aff'd. 320 F.2d 509 (3 Cir. 1963); Gottesman v. General Motors Corp., 221 F.Supp. 488 (S.D.N.Y. 1963)."

27. "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."
   Dissenting in Henslee v. Union Planters National Bank & Trust Company, 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259.

28. See also Gottesman v. General Motors Corp., 414 F.2d 956 (2d Cir. 1969) reversing 221 F.Supp. 488 (S.D.N.Y.1968) and Isidor Weinstein Investment Co. v. Hearst Corporation, 310 F.Supp. 390 (N. D.Cal.1970) the sequel to 303 F.Supp. 646 (N.D.Cal.1966).

Standing has yet another aspect. Private claimants under the antitrust laws must show that *they*—even though given the status of private attorneys—general suffered some injury to "business or property" as distinguished from public injury [29] resulting from anticompetitive practices. VWoA contends that Calnetics falls short of this requirement since Section 7 of the Clayton Act [15 U.S.C. § 18] concerns itself with anticipated and prospective antitrust consequences and, as such, damages are inappropriate. The argument is adequately answered in *Kirihara, supra,* and needs no amplification here. That, however, is not determinative of the standing of Calnetics for equitable relief. Injunction and/or divestiture are concerned with the future. Actual present damage need not be shown as the predicate for such relief. Zenith Radio Corporation v. Hazeltine Research, Inc., et al., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

The evidence of individual as opposed to public injury is abundant. Calnetics is a company engaged in the marketing of air conditioners for Volkswagen automobiles as is VPC, the acquired company. It is, in reality (though not the most effective) a competitor in the marketplace. The viability of Calnetics—as David or Goliath—is not determinative of its standing to prosecute this action. So long as it remains an active entity, ready, willing and able to sell its goods Calnetics has standing in fact to maintain this action.

2. The Product Market.

An essential inquiry in the determination of a violation of Section 7 of the Clayton Act [15 U.S.C. § 18] is the delineation of the line of commerce or product market. It is essential because "the product" defines the competitive environment to which the protection of Section 7 is extended.[30] Reported cases have largely been limited to governmental concerns for the protection of competition where courts have narrowed and broadened the product market without real criteria or consistency. The dilemma is evident in the language of Mr. Justice Stewart in United States v. Von's Grocery Company, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966):

" . . . The sole consistency that I can find is that in litigation under § 7, the Government always wins. . . ."

The literature [31] discussing Section 7 of the Clayton Act [15 U.S.C. § 18] enumerates line of commerce considerations as threefold—1. reasonable interchangeability of use, 2. cross elasticity of demand,[32] and 3. peculiar characteristics and uses.[33] The distinctions are purely semantic. Analysis of competition must be predicated on the product involved. Perhaps a more realistic view would be to couch the test in terms of a single consideration of the product or its "equivalents".[34]

VWoA maintains that the test applicable here is the broad market of automobile air conditioners as defining the relevant product market. Analysis shows the fallacy of the assumption. Although there is a kinship (in that they accomplish the same purpose—cool the automobile) between a Buick air conditioner and a Volkswagen air conditioner, the relationship is purely "shirttail". Even the

---

29. The role of Don Quixote in protecting the honor of fair damsel "Public" is left to the Attorney General of the United States by statute and government's traditional role as parens patriae.

30. United States v. Penn-Olin Chemical Co. et al., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775.

31. Including court decisions.

32. Both reasonable interchangeability of use and cross elasticity of demand were first articulated in United States of America v. E. I. DuPont DeNemours & Company, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1955).

33. United States of America v. E. I. DuPont DeNemours & Company et al., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

34. There appears to be no good reason that the patent law should have a monopoly on "equivalents".

relationship of Volkswagen air conditioners to those of domestic and foreign low-horsepowered automobiles [35] lends no aid to VWoA's position—they simply are not interchangeable, i. e., they are not equivalents. The evidence shows that an air conditioner designed to operate in a Volkswagen automobile,[36] with its air-cooled, rear-mounted engine, will simply not operate without modification or substitution of parts, in any other automobile now operating on the highways of the United States. Equivalents cannot be broad brushed to minimize or maximize a relevant product market. Limitations are necessary to make the considerations reasonably reflect what actually happens in the marketplace. Certainly no one can argue that the air conditioner marketed for Volkswagen automobiles by VPC, or any other supplier, would be purchased by anyone other than those who own one of the Volkswagen family of automobiles. Concern for the realities of the marketplace was expressed by the Supreme Court in defining the relevant product market in Times Picayune Publishing Company et al. v. United States of America, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). In *Times Picayune, supra,* Mr. Justice Clark writing for the majority voices this concern in note 31 as:

"31. For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small . . . . "

■ VWoA further suggests that because Calnetics' manufacturing facilities are capable of producing other air conditioners with "little modification" the relevant market is somehow defined more broadly. VWoA would have this Court so read United States of America v. Columbia Steel Company, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). VWoA misreads the *Columbia Steel* case, *supra.* Though there is a passing reference to the interchangeability of manufacturing facilities it is not the holding or rationale of the case. The Supreme Court's consideration in *Columbia Steel, supra,* was the impact the withdrawal of Consolidated Steel Corporation (the acquired company) as a buyer on the open market would have on the producers of rolled steel products. In that context the Court makes reference to the capacity of a rolled steel producer to employ the same facilities to "make other products interchangeably with shapes and plates," together with the rolled steel products being offered in the marketplace. Nowhere in the opinion does the Court lay down, or suggest, a rule that interchangeability of *production facilities* affects the consideration of a relevant product market. No other authority has been cited and none has been found by this Court that suggests that relevant product market should be measured by the capacity of the producer rather than the *product he sells* in the marketplace. Competition, by its very definition, must be measured by the marketplace of the same or equivalent products. To hold otherwise would mean that a producer who decides to sell automobile air conditioners but is capable, with little or no plant changes, of producing refrigerator compressors is measured in the competitive marketplace by inclusion of refrigerators as part of the relevant product market. The statement of the hypothesis discloses its absurdity. Relevant market can be measured only to the product sold. Whether applied broadly or as a permissible submarket [37] the relevant market in this case can be measured only by air conditioners sold for use in the Volkswagen family of automobiles by VPC, DPD, Calnetics, Heatransfer and Coolaire.

---

35. Pinto, Vega, Duster, Toyota, Opel and the like.

36. Including the "Volkswagen family" of automobiles—Porsche and Karmann Ghia.

37. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

### 3. The Geographic Market.

The second and somewhat overlapping consideration in measuring the effects of an acquisition is the geographic area of competition. In Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court sets forth the critical inquiry as:

" . . . The geographic market selected must, therefore, both 'correspond to the commercial realities' of the industry and be economically significant." (At page 336, 82 S.Ct. at page 1530)

Commercial reality in our consideration of the Volkswagen automobile air conditioner market shows that the acquired company, VPC, competes in varying degrees with DPD, Calnetics, Heatransfer and Coolaire throughout the United States. More importantly, the consideration of a broad national market or a narrow regional market would compel the same result in the factual context of this case.

### 4. Violation of § 7 of the Clayton Act [15 U.S.C. § 18].

The genesis of Section 7 of the Clayton Act [15 U.S.C. § 18] in its present form can be summarized as the recognition by Congress that Sections 1 and 2 of the Sherman Act [38] and the original enactment of Section 7 in 1914 were inadequate to maintain a free and strong competitive market in the United States. Mergers and acquisitions were being saved more by form than substance and began threatening to negate the concern of Congress expressed in its earlier enactment of antitrust legislation. With the enactment of the Cellar-Kefauver Antimerger Act,[39] Congress laid to rest the generally held view that the exclusive attack upon vertical mergers had to be upon the difficult and near impossible

finding of violations of Sections 1 and 2 of the Sherman Act.[40]

The first consideration of a vertical acquisition of the stock of one company by another in response to new legislation was in United States v. E. I. DuPont DeNemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). Applying Section 7 of the Clayton Act [15 U.S.C. § 18] in its present form to the 1917–19 acquisition by the DuPont Company of 23 percent of the stock of General Motors the Supreme Court says:

"We hold that any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce. . . ."

■ VWoA argues that its acquisition of its captive supplier Delanair cannot affect the competitive position of Calnetics vis-a-vis VWoA and there is therefore no violation of Section 7 of the Clayton Act [15 U.S.C. § 18]. VWoA misses the point. Section 7 does not proscribe acquisitions which may damage or otherwise injure a particular participant in the market but rather condemns mergers or acquisitions which have the reasonable probability of restraining competition. Calnetics' position in the marketplace as an actual competitor to VPC, or as a potential competitor in markets now claimed foreclosed, justifies the complaint as we have determined earlier. The inquiry here is twofold—damages and/or injunctive relief.

■ The antitrust laws were not enacted nor have they ever been imple-

---

38. 15 U.S.C. § 1 and 15 U.S.C. § 2 respectively.

39. Antimerger Act of December 2, 1950. 64 Stat. 1125.

40. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947) ; United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed.

1533 (1947) ; United States of America v. Paramount Pictures, Inc., et al., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948).

See also F.T.C., Report on Corporate Mergers and Acquisitions, H.R. Doc. No. 169. 84th Cong. 1st Sess. (1955) ; H.R. Rep. No. 1191, 81st Cong., 1st Sess. 11 (1949).

mented by the courts to secure to any producer of goods a private preserve for its cwn exploitation. The purpose of the antitrust laws is the preservation of competition and so the producer who legitimately encroaches upon the private market preserve of another can do so with impunity so long as its actions neither restrain competition nor tend toward monopoly. This is the command of Sections 1 and 2 of the Sherman Act and the provisions of the Robinson-Patman Act proscribing price discrimination. Section 7 of the Clayton Act presents a perplexing dichotomy in its application to litigation brought by private parties. Determination of damage and equitable relief claims must necessarily include vastly different considerations.

▆▆▆ The position of an individual plaintiff in a Section 4 treble damage suit is individual, and impact must be viewed in the crucible of competitive effect on plaintiff's own private transaction in the market. Damages recoverable by a private antitrust claimant deal with actual, present and reasonably forseeable effects of an anticompetitive merger on the business or property owned by plaintiff. Calnetics has fallen short in its necessary proof of causal connection to its claimed loss of the VPI market and consequently a motion to dismiss has previously been granted by the Court.

▆▆▆ Equitable relief presents different considerations. A case for divestiture is one in which a single competitor is but one element in the mosaic of competition. Divestiture affects all of the competitors in the marketplace and so all must be considered in the determination of violation vel non. Section 7 of the Clayton Act [15 U.S.C. § 18] was not enacted to equate "competition" with "survival" of a single entity but rather to provide the opportunity to freely enter and engage in the marketplace. In this respect there is no "target" at which to aim the anticompetitive acquisition. Competitors are victims of the fallout of the destruction of competition. A viable plaintiff competing in, or ready to enter into the marketplace gives the Court the

cause for inquiry. The inquiry is the marketplace and the effects of the claimed anticompetitive acquisition upon the marketplace. For that reason a Section 7 divestiture plaintiff acts somewhat as a Rule 23 class representative and need not satisfy the requirement of "impact" in its classical antitrust definition. In a nation that now exceeds one trillion, forty six billion dollars in gross national product, government cannot possibly be relied upon to provide vindication of every person or entity aggrieved by a violation of the antitrust laws. It must be left to private litigants to guarantee to themselves the assurance that the future will not repeat the past. Section 7 of the Clayton Act deals only with the future measured by reasonable probabilities of acquisition. It is that measure the Court applies here.

▆▆▆ In the consideration of the probable effects of the acquisition of Delanair by VWoA, Delanair sales are markedly significant. As an independent subsidiary of Delaney-Galley, Delanair had captured 85.5% of the Volkswagen air conditioner business by 1967. In 1968 DPD and Calnetics reduced Delanair's position to an 82.3% market share. With the problems of 1968 still lingering and intensifying in 1969, Delanair dropped to 52.4%. Significantly DPD and Calnetics increased their respective positions to 32.5% and 8.9% and new entries Heatransfer and Coolaire contributed 5.4% and .6% respectively to the slide of Delanair. VWoA acquired Delanair September 26, 1969 and now as VPC the hold slipped to 51.8% in 1970. Viewed as a cold statistic it appears that the merger had no real effect on the Volkswagen air conditioner business. Not lost in the evidence, however, is the pessimistic picture drawn by Mr. Harwood-Jones that counsel for VWoA in another context would have the Court view as the certain demise of Delanair as a competitor in the marketplace. With little change in the unit being offered—but with the new name—new management— and new financing furnished by VWoA, VPC in 1971 took a giant step to 71.0%

of the market. In the same period DPD dropped to 26.0% with the capacity and product that was considered by both VWoA and Delaney-Galley as the most competitive product on the market. Heatransfer with 2.3%, Calnetics with .4% and Coolaire with .3% had become for all practical purposes, nonexistent in Volkswagen automobile air conditioner production.

A dispassionate review of these facts leads to the inevitable conclusion that this acquisition is monopoly in its incipiency. As such, the acquisition is in violation of Section 7 of the Clayton Act [15 U.S.C. § 18].

■ To protect its acquisition from divestiture VWoA argues that its interest and investment in acquiring Delanair had considerations totally removed from scrutiny of the antitrust laws. It protests that faced with the events of late 1968 and the air-condition season of 1969, it was compelled to acquire Delanair—1. to guarantee a continued source of air conditioners and 2. to protect the Volkswagen reputation by offering an air conditioner qualitatively in keeping with Volkswagen excellence. Although this motivation finds some support in the evidence, high motivation and good faith does not rescue an otherwise anticompetitive acquisition from the attack of the antitrust laws. The concern of the courts in considering "beneficial" mergers or acquisitions is expressed in Ford Motor Co. v. United States, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972) when the Supreme Court says:

"It is argued, however, that the acquisition had some beneficial effect in making Autolite a more vigorous and effective competitor against Champion and General Motors than Autolite had been as an independent. But what we said in United States v. Philadelphia National Bank, supra [374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed. 2d 915], disposes of that argument. A merger is not saved from illegality under § 7, we said, 'because, on some ultimate reckoning of social or econom-

ic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress when it enacted the amended § 7. Congress determined to preserve our traditionally competitive economy. It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid.' 374 U.S., at 371, 83 S.Ct. [1715], at 1745, 1746 [10 L.Ed.2d at 949]."

■ Before leaving the subject, a word about the claim VWoA that it (as a buyer) was never a customer of Calnetics, that it dealt exclusively with Delanair and therefore there is no change in the competitive market in Volkswagen air conditioners.

The distributive pattern of the Volkswagen family of automobiles is important to this consideration. VWoA, as a wholly owned subsidiary of Volkswagen Werk A.G., manufacturer of Volkswagen automobiles in Germany, imports and distributes Volkswagen automobiles in the United States. Distribution is accomplished through fourteen regional distributors throughout the United States.

Although contemplated in the past and left to possibility in the future, Volkswagen automobiles do not have so-called OE [41] or factory installation of air conditioners. With the lack of factory installation, air conditioners can be installed—1. by VWoA, either on order of some distributor or upon its own plant installation ready for delivery to distributors, 2. by one of the fourteen regional distributors—again—on order of a dealer or upon its own plant installation ready for delivery to a dealer, 3. by the dealer on order of his customer, or 4. by some independent installer dealing in automative products on purchase by an owner of a Volkswagen automobile, either in its new or used condition.

41. O.E. is original equipment installed at the factory during assembly of the automobile.

It takes little imagination and little or no expertise to recognize that, preferentially, air conditioners will be installed in Volkswagen automobiles in the descending levels of distribution. VWoA cites numbers in the millions of Volkswagens driving the highways of the United States as a potential market for Calnetics and the other producers to put their efforts. Assuming this potential far outstrips the total sales of 96,000 Volkswagen air conditioners in 1971, the plain fact is that this potential has already passed the marketing efforts of the three preceding levels of distribution without success. More importantly, these levels can offer their wares under the tacit, if not express, imprimatur of the Volkswagen name. The vice of the distributive pattern as it must inevitably be affected by VWoA's acquisition of Delanair is the "clog on competition" condemned by Section 7 of the Clayton Act [15 U.S.C. § 18].

■ 4. The Failing Company Defense.

VWoA would have the Court save its acquisition of Delanair by application of the failing company doctrine. In International Shoe Company v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431, the Supreme Court first articulated a circumstance in which the elimination of competition by merger or acquisition could survive scrutiny under Section 7 of the Clayton Act. Analyzing the facts surrounding the financial difficulties of the acquired company, the court says at page 302, 50 S.Ct. at page 93:

"In the light of the case thus disclosed of a corporation with resources so depleted and the prospect of rehabilitation so remote that it faced the grave probability of a business failure with resulting loss to its stockholders and injury to the communities where its plants were operated, we hold that the purchase of its capital stock by a competitor (there being no other prospective purchaser), not with a purpose to lessen competition, but to facilitate the accumulated business of the purchaser and with the effect of mitigating seriously injurious consequences otherwise probable, is not in contemplation of law prejudicial to the public and does not substantially lessen competition or restrain commerce within the intent of the Clayton Act. . . ."

See also Citizen Publishing Company v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) emphasizing the narrow scope of the failing company doctrine.

VWoA falls short of its burden on both tests—1. the grave probability of business failure and 2. the unavailability of prospective purchasers. Financial statements of Delanair for the period ending August 30, 1969, just twenty-six days before the acquisition, show a net loss of $262,387. Carrying forward retained earnings from 1968 in the sum of $526,665. Delanair was still in a retained earnings surplus position of $312,278 at the time of its acquisition by VWoA. Certainly Delanair was having its problems but accomodations had been made with its creditors and it had in the wings a capable, though unwilling, parent whose prime concern was to sell Delanair because "we had acquired this knowledge and were already achieving a capability". Delanair had served the acquired purpose for Delaney-Galley. Having served its purpose and now occasioning some financial concern the decision to sell solved the problem.

VWoA fails to meet the second requirement also. Delaney-Galley had in mind a well-defined route to follow in the offering of Delanair for sale. The route was defined by Mr. Harwood-Jones and his Board of Directors to obtain the best possible price for its American subsidiary. No effort was made to put the sale in the hands of a broker. Leads offered to Mr. Harwood-Jones were ignored because they were not the kind of people he thought could make the kind of arrangements he wanted. The press on VWoA to purchase Delanair was one considered in the best interest of Delaney-Galley and single-mindedly Mr. Harwood-Jones obtained his objective in Sep-

tember, 1969. Never could VWoA be considered as the "only available purchaser" but rather as the best available purchaser. "Failing company" simply has no factual support in the evidence.

Armed with the confidence that relief in an antitrust case must be effective to redress the violation and to restore competition [42] the Court now calls upon the parties to present plans for accomplishing the relief granted. Said plans to be submitted to the Court within thirty (30) days of the filing of this memorandum and order.

Judgment is for the plaintiff upon the equitable relief prayed. Details of the divestiture to abide the further entry of a supplemental judgment adopting an appropriate plan.

This memorandum opinion and order shall be deemed Findings of Fact and Conclusions of Law as permitted by Federal Rules of Civil Procedure, Rule 52(a).

See, also, D.C., 348 F.Supp. 606.

---

42. Ford Motor Co. v. United States, *supra.*